[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14780
_____

D.C. Docket No. 0:11-cv-62644-RNS

CARLOS ZELAYA,
individually, and
GEORGE GLANTZ,
individually and as trustee of the George Glantz Revocable Trust,
for themselves and on behalf of all those persons similarly situated,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 30, 2015)

Before TJOFLAT, JULIE CARNES, and GILMAN,* Circuit Judges.

_____

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by
designation.

JULIE CARNES, Circuit Judge:

The plaintiffs in this case, Carlos Zelaya and George Glantz, are victims of one of the largest Ponzi schemes in American history:  the much-publicized Ponzi scheme orchestrated by R. Allen Stanford.  All Ponzi operations eventually unravel, and when the scheme that had victimized Plaintiffs was publicly revealed to have been a fraud, Plaintiffs were taken by surprise.  Yet, according to Plaintiffs, the federal agency entrusted with the duty of trying to prevent, or at least reveal, Ponzi schemes was not all that surprised.  To the contrary, this agency, the United States Securities and Exchange Commission ("SEC"), had been alerted over a decade before that Stanford was likely running a Ponzi operation.  According to Plaintiffs, notwithstanding its knowledge of Stanford's likely nefarious dealings, the SEC dithered for twelve years, content not to call out Stanford and protect future investors from his fraud.  And even though the SEC eventually roused itself to take action in 2009, by then, of course, the money was long gone, and many people lost most of their investments.

Pursuant to the Federal Tort Claims Act, Plaintiffs sued the United States in federal court, alleging that the SEC had acted negligently.  The federal government moved to dismiss, arguing that it enjoyed sovereign immunity from the lawsuit.  The district court agreed, and dismissed Plaintiffs' case.  Plaintiffs now appeal that

2

dismissal to this Court.  In reviewing the district court's dismissal, we reach no conclusions as to the SEC's conduct, or whether the latter's actions deserve Plaintiffs' condemnation.  We do, however, conclude that the United States is shielded from liability for the SEC's alleged negligence in this case.  We therefore affirm the district court's dismissal of the Plaintiffs' complaint.

## I.    Factual Background

As noted, this action arises from one of the largest Ponzi schemes in history.[1]  In the 1990s and 2000s, financier R. Allen Stanford ("Stanford" or "Allen Stanford") engineered investments in his Antiguan-based Stanford International Bank Ltd. ("Stanford Bank") through a network of entities:  Stanford Bank itself; Stanford Group, with more than twenty-five offices across the United States; Louisiana-based Stanford Trust Company; and Miami, Houston, and San Antonio-based Stanford Fiduciary Investor Services.  Through this network, Stanford Bank issued high-interest certificates of deposit ("CDs") to tens of thousands of investors across the globe, ultimately accumulating billions of dollars.  Unbeknownst to these investors, however, Stanford Bank never invested this

---

[1]  The facts considered on this appeal are taken from the allegations set out in the Plaintiffs' amended complaint.  In reviewing the grant of a motion to dismiss, we "accept[] the allegations in the complaint as true and costru[e] them in the light most favorable to the nonmoving party."  *Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308 (11th Cir. 2006).

money in securities, as it had promised to do.  Instead, the Bank funneled new infusions of cash to earlier investors and to Allen Stanford himself.

As early as 1997, the SEC had been alerted that Stanford was conducting a Ponzi scheme through the above companies.  One of these companies, Stanford Group, had been registered with the SEC since 1995 as a broker-dealer and investment advisor, which meant that it was subject to SEC reporting requirements.  Yet, despite four investigations between 1997 and 2004, the SEC took no action to stop the fraud until 2009.

In its first investigation, begun in 1997, the SEC discovered that Stanford had contributed $19 million in cash to Stanford Group, which caused the SEC "concern[] that the cash contribution may have come from funds invested by customers at [Stanford Bank]."  The Branch Chief of the Fort Worth, Texas SEC office conducting the investigation considered the purported returns on Stanford Bank's CDs to be "absolutely ludicrous" and believed that they were not "legitimate CDs."  The Assistant District Administrator heading the investigation warned the Branch Chief to "keep your eye on these people [referencing Stanford] because this looks like a Ponzi scheme to me and someday it's going to blow up."  The following year, the successor of that Assistant District Administrator stated, "[A]s far as I was concerned at that period of time[,] . . . we all thought it was a

4

Ponzi scheme to start with. Always did." The investigating group concluded, "[P]ossible misrepresentations. Possible Ponzi scheme." Still, the SEC took no action against Stanford.

In the SEC's second investigation, begun in 1998, the investigators decided that "Stanford was operating some kind of fraud" through Stanford Group. They noted that Stanford Group was "extremely dependent upon [Stanford Bank's very generous commission] compensation to conduct its day-to-day operations." Despite this, the SEC did nothing.

In 2002, the SEC investigated Stanford a third time, determining that Stanford Group should be assigned the SEC's highest risk rating because of the SEC's "suspicions the international bank [Stanford Bank] was a Ponzi scheme" and because Stanford Bank's "consistent above-market reported returns" were likely illegitimate. Notwithstanding this concern, the SEC, once again, did nothing.

In 2004, the SEC conducted a fourth investigation of Stanford, again reaching the conclusion that Stanford Bank "may in fact be a very large Ponzi scheme." Sitting on this information for five more years, the SEC finally took

enforcement action against Stanford and his various business entities in 2009.[2]  By then though, most of the investors' money was gone, and the SEC has been able to recover only $100 million of the $7 billion invested in Stanford Bank.

Plaintiffs Zelaya and Glantz were two of the many investors who thought they were purchasing legitimate securities.  Zelaya invested $1 million and Glantz invested approximately $650,000.  Both plaintiffs have lost almost their entire investments.

## II.    **Procedural Background**

Pursuant to the Federal Tort Claims Act ("FTCA"), and alleging one count of negligence based on the SEC's failure to act upon its knowledge of Stanford Group's participation in the Stanford Bank Ponzi scheme, Plaintiffs filed suit in 2011 against the United States ("the Government") in the United States District Court for the Southern District of Florida.  In their initial complaint, Plaintiffs identified two separate statutory duties that the SEC had allegedly breached through its inaction.  First, Plaintiffs asserted a "notification claim" pursuant to the

---

[2]  In February 2009, the SEC filed civil proceedings against Stanford Group.  *See* Complaint at 1, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-298-N (N.D. Tex. Feb. 17, 2009). Stanford was ordered to disgorge $6.7 billion to the SEC and he received a $5.9 billion penalty. *See* Order at 17, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-298-N (N.D. Tex. Apr. 25, 2013). On June 18, 2009, Stanford was indicted on mail fraud, wire fraud, conspiracy to commit securities fraud and money laundering, and conspiracy to obstruct an SEC investigation.  He was convicted in 2012 and sentenced to 110 years in prison.  *See* Judgment at 3, *United States v. Stanford*, No. 4:09-cr-00342-01 (S.D. Tex. June 14, 2012), *appeal docketed*, No. 12-20411 (5th Cir. June 19, 2012).

6

Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa-*lll*.  Specifically,

Plaintiffs relied on § 78eee(a)(1), which provides that "[i]f the [SEC] is aware of

facts which lead it to believe that any broker or dealer subject to its regulation is in

or is approaching financial difficulty, it shall immediately notify SIPC."  SIPC is

an acronym for the Securities Investor Protection Corporation, which is a non-

profit corporation with which Stanford Group, as a registered broker-dealer, was

required to maintain membership.  Plaintiffs note that although Stanford Group

was subject to regulation by the SEC and the SEC had allegedly concluded that

Stanford Group was involved in a Ponzi scheme, the SEC failed to notify SIPC, as

required by § 78eee(a)(1).

Second, Plaintiffs also raised a "registration claim" pursuant to 15 U.S.C.

§ 80b-3(c).  Plaintiffs contend that § 80b-3(c) required the SEC to revoke the

registration of Stanford Group, but the SEC failed to do so.

The Government responded with a motion to dismiss.  As discussed below,

while the FTCA, as a general matter, waives what would otherwise be the federal

government's sovereign immunity from legal actions for torts committed by its

employees, there are exceptions to that general waiver.  In its motion to dismiss,

the Government argued that one of those exceptions, the "discretionary function

exception," barred Plaintiffs' claims based on the alleged breach of both of the

7

above statutory duties.  Given the application of this exception, the Government contended that the district court lacked subject matter jurisdiction.

The district court granted the Government's motion to dismiss with regard to the registration claim, holding that the discretionary function exception applied and therefore preserved the Government's sovereign immunity on that claim.  The district court, however, denied the Government's motion to dismiss with regard to Plaintiffs' notification claim.

Plaintiffs then filed an amended complaint, re-alleging the surviving notification claim as the sole basis for their negligence action.  The Government again moved to dismiss, this time raising the "misrepresentation exception" as a bar to its capacity to be sued under the FTCA.  Although it had earlier rejected the application of the discretionary function exception to the notification claim, the district court agreed that the misrepresentation exception did apply and that it precluded this claim.  As a result, the court concluded that it likewise lacked subject matter jurisdiction on the notification claim and therefore granted the Government's motion to dismiss.  With no remaining claims, the court entered a final judgment for the Government.  Plaintiffs filed the present appeal, contending that the district court should not have dismissed either the registration claim or the notification claim.

8

### III.    Discussion

#### A.    Sovereign Immunity, Subject Matter Jurisdiction, and the Federal Tort Claims Act—Generally

The district court dismissed Plaintiffs' claims based on an absence of subject matter jurisdiction.  We review a district court's dismissal of an action for lack of subject matter jurisdiction *de novo*.  *Motta ex rel. A.M. v. United States*, 717 F.3d 840, 843 (11th Cir. 2013).

It is well settled that the United States, as a sovereign entity, is immune from suit unless it consents to be sued.  *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1188 (11th Cir. 2011) (citing *United States v. Dalm*, 494 U.S. 596, 608 (1990)); *accord Alden v. Maine*, 527 U.S. 706, 758 (1999) ("To the extent Maine has chosen to consent to certain classes of suits while maintaining its immunity from others, it has done no more than exercise a privilege of sovereignty concomitant to its constitutional immunity from suit.").  Through the enactment of the FTCA, the federal government has, as a general matter, waived its immunity from tort suits based on state law tort claims.  *Millbrook v. United States*, ___ U.S. ___, 133 S. Ct. 1441, 1443 (2013) (citing *Levin v. United States*, ___ U.S. ___, 133 S. Ct. 1224, 1228 (2013)).  But in offering its consent to be sued, the United States has the power to condition a waiver of its immunity as broadly or narrowly as it wishes, and according to whatever terms it chooses to impose.  *United States v.*

9

*Sherwood*, 312 U.S. 584, 586 (1941) ("[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit."). That being so, a court must strictly observe the "limitations and conditions upon which the Government consents to be sued" and cannot imply exceptions not present within the terms of the waiver. *Soriano v. United States*, 352 U.S. 270, 276 (1957). If there is no specific waiver of sovereign immunity as to a particular claim filed against the Government, the court lacks subject matter jurisdiction over the suit. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475–76 (1994).

But that which the Sovereign gives, it may also take away, and the Government has done so through statutory exceptions in 28 U.S.C. § 2680, including the § 2680(a) discretionary function exception and the § 2680(h) misrepresentation exception, which serve to block the waiver of sovereign immunity that would otherwise occur under the FTCA. *See* 28 U.S.C. § 2680. These exceptions "must be strictly construed in favor of the United States," and when an exception applies to neutralize what would otherwise be a waiver of immunity, a court will lack subject matter jurisdiction over the action. *JBP Acquisitions, LP v. United States ex rel. FDIC*, 224 F.3d 1260, 1263–64 (11th Cir. 2000) (internal quotation marks omitted).

10

**B.    Interplay Between 28 U.S.C. §§ 1346(b)(1), 2674(b)(1), and 2680**

Any plaintiff seeking to sue the United States under the FTCA must satisfy two initial statutory burdens to establish jurisdiction. *Clark v. United States*, 326 F.3d 911, 912 (7th Cir. 2003). First, as with all suitors in federal courts, the plaintiff must identify an explicit statutory grant of subject matter jurisdiction, which in the case of the FTCA is 28 U.S.C. § 1346(b)(1). *Id.* This statute provides:

> **Subject to the provisions of chapter 171 of this title** [i.e., 28 U.S.C. §§ 2671–2680], the **district courts** . . . shall **have exclusive jurisdiction of civil actions** on claims **against the United States**, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death **caused by the negligent or wrongful act or omission of any employee of the Government** while acting within the scope of his office or employment, **under circumstances where** the United States, if **a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred**.

28 U.S.C. § 1346(b)(1) (emphasis added). Translated, any time the federal government is sued based on the act of an employee performed within the scope of his employment duties, federal district courts will have exclusive jurisdiction of such claims. In addition, § 1346(b)(1) sets, as a predicate, a requirement that the circumstances be such that a private person would be liable under the law of the state where the federal employee's act or omission occurred, had a private person so acted.

11

Because the United States is a sovereign entity, the second jurisdictional requirement is a statute that waives its sovereign immunity. *Clark*, 326 F.3d at 912; *see also Meyer*, 510 U.S. at 475 ("Sovereign immunity is jurisdictional in nature."). This waiver of sovereign immunity is provided in chapter 171 of Title 28, which chapter includes §§ 2671–2680. The waiver is most directly referenced in § 2674.

As the texts of the two statutes indicate, jurisdiction depends on both statutes being satisfied. Indeed, § 1346(b)(1) explicitly makes its grant of jurisdiction subject to the conditions of chapter 171, with its introductory phrase declaring that the sub-section is "[s]ubject to the provisions of chapter 171 of this title." Two provisions found in chapter 171 are pertinent in this case. Section 2674 affirmatively establishes the Government's liability for tort claims, but reiterates § 1346(b)(1)'s requirement conditioning liability by the Government on a showing that a private individual would be liable under like circumstances.[3] Finally, § 2680, the final section of chapter 171, lists exceptions to the United States' waiver of sovereign immunity, under which "[t]he provisions of this chapter and section 1346(b)(1) of this title shall not apply." *See* 28 U.S.C. § 2680.

---

[3] "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674.

12

Thus, between § 1346(b)(1) and chapter 171, there are numerous prerequisites to, and limitations on, the grant of jurisdiction over tort suits against the United States. In the present case, two obstacles potentially block Plaintiffs' efforts to use the FTCA to sue the Government based on the SEC's alleged negligence in this case. First, as noted, there are exceptions, found within the FTCA itself, that preclude use of that statute by a plaintiff to sue the Government for tort claims. And it is the applicability of those exceptions on which the district court and parties focused below, with the court ultimately determining that two statutory exceptions blocked Plaintiffs' efforts to use the FTCA to pierce the Government's sovereign immunity.

But there is another obstacle that was largely ignored by the district court and the parties. Specifically, even when no applicable exception exists, the FTCA does not provide an open field for a litigant to sue the federal government for the alleged torts of its agents. Instead, the particular statute granting subject matter jurisdiction over such claims—28 U.S.C. § 1346(b)(1)—constrains a litigant as to the type of claims that can properly be brought pursuant to the statute. That is, both §§ 1346(b)(1) and 2674 preclude liability of the federal government absent a showing by the plaintiff that a private individual who had acted as did the federal

13

employee, in like circumstances, would be liable for the particular tort under governing state law where the tort occurred.

We address first the impact of the above requirement on this litigation, after which we discuss the applicability of statutory exceptions in this case.

### C.    The Federal Tort Claims Act's Requirement of a State Law Analogue

#### 1.    The Need for a State Tort Analogue

The FTCA was enacted to provide redress to injured individuals for ordinary torts recognized by state law but committed by federal employees.  *Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) ("*Ochran II*"); *Sellfors v. United States*, 697 F.2d 1362, 1365 (11th Cir. 1983) (Congress "was concerned primarily with providing redress for the garden variety common law torts recognized by state law.").  Indeed, the reference in § 1346(b)(1) to "the law of the place where the act or omission occurred" means the law of the state where the alleged tort occurred.  *Stone v. United States*, 373 F.3d 1129, 1130 (11th Cir. 2004).

As a corollary of that principle, it is well established that a federal statute cannot constitute the "law of the place" because "[t]he FTCA was not intended to redress breaches of federal statutory duties."  *Sellfors*, 697 F.2d at 1365.  Stated another way, the fact that a federal employee has failed to perform duties imposed

14

by federal law is insufficient by itself to render the federal government liable under the FTCA. *Pate v. Oakwood Mobile Homes, Inc.*, 374 F.3d 1081, 1084 (11th Cir. 2004). Instead, a state tort cause of action is a *sine qua non* of FTCA jurisdiction, and we have dismissed FTCA suits that have pleaded breaches of federal duties without identifying a valid state tort cause of action. *See, e.g.*, *Ochran II*, 273 F.3d at 1317.

Yet notwithstanding their inability to support an FTCA suit, federal statutes and regulations can still be important. First, they "may provide evidence that the government has assumed duties analogous to those recognized by local tort law." *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1158 (D.C. Cir. 1985). Similarly, they "may provide the standard of care against which the government's conduct should be assessed." *Id.* at 1159. Accordingly, the negligent performance of duties set out in federal statutes and regulations may shore up a claim under the FTCA, "but *only* if there are analogous duties under local tort law." *Id.* at 1157 (emphasis in original). In short, while a federal employee's breach of a federally-imposed duty may bolster a FTCA claim, it cannot, on its own, create the duty that gives rise to that claim. That task falls to the applicable state jurisdiction.

When the complaint involves one of the "garden variety common law torts," this requirement of a state tort cause of action can be easily met. *Sellfors*, 697 F.2d

15

at 1365.  For example, a plaintiff suing based on an automobile accident caused by a federal employee would readily find a comparable state-law tort to buttress his FTCA claim.  Difficulties arise, however, when the activities at issue are "uniquely governmental functions" with unique duties that suggest no obvious analogue among private actors.  *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955).  Without question, it can be difficult to imagine how a private person could be liable for breaches of such quintessentially governmental functions as the regulation of air travel, prisoners, drugs, and livestock because no private person has such duties under state law.[4]  *See, e.g.*, *Smoke Shop, LLC v. United States*, 761 F.3d 779, 780 (7th Cir. 2014) (drug enforcement regulations); *Alfrey v. United States*, 276 F.3d 557, 559 (9th Cir. 2002) (regulation of prison inmates); *Dorking Genetics v. United States*, 76 F.3d 1261, 1262 (2d Cir. 1996) (cattle inspections); *Howell v. United States*, 932 F.2d 915, 916 (11th Cir. 1991) (airline safety regulations).

Notwithstanding these conceptual difficulties, the Supreme Court long ago made clear that there is no exception from FTCA liability solely because the particular tort arose from the performance of uniquely governmental functions.

---

[4]  Further, the analogy that must be made is one between the federal government and a private person, and thus a state law that permits tort claims against the state or local government does not suffice.  *United States v. Olson*, 546 U.S. 43, 44 (2005); *Maradiaga v. United States*, 679 F.3d 1286, 1292 (11th Cir. 2012).

16

*Indian Towing*, 350 U.S. at 64. So, the question arises, how should the FTCA be applied when uniquely governmental functions are at issue? We have recognized that "[n]ormally, the most analogous approach in determining whether the government is liable in the regulator-enforcer context under state law is the [G]ood [S]amaritan doctrine." *Pate*, 374 F.3d at 1086; *see also Indian Towing*, 350 U.S. at 64–65 ("[T]he statutory language [of 28 U.S.C. § 2674] is 'under like circumstances,' and it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his '[G]ood Samaritan' task in a careful manner."). Thus, in cases where the plaintiff points to the violation of a federal statutory or regulatory duty, we generally look to the applicable state's Good Samaritan doctrine to decide if the plaintiff has alleged a state tort claim that satisfies the § 1346(b)(1) requirement and thereby opens the door for a claim under the FTCA. *See, e.g.*, *Sellfors*, 697 F.2d at 1367; *Howell*, 932 F.2d at 918; *Pate*, 374 F.3d at 1086.

> 2.     The Plaintiffs' Negligence Claim

Here, Plaintiffs' first amended complaint alleged only the tort of negligence, without specifying which state's law of negligence applied and in apparent ignorance of the fact that identifying an analogous state tort cause of action is required for an FTCA cause of action. Instead, Plaintiffs alleged generally that the

17

SEC breached "the duty of care owed to investors" as a result of violations of its federal statutory duties to revoke Stanford Group's registration and to notify SIPC of Stanford Group's financial hazard.  But, as explained, mere breaches of federal statutory duties are, as a threshold matter, insufficient to support a cause of action. *Sellfors*, 697 F.2d at 1365.  Unless Plaintiffs can identify corresponding state law duties, they have, at the least, failed to state a claim, and arguably their lapse deprives the court of even subject matter jurisdiction over the action.  *Ochran II*, 273 F.3d at 1317; *Bennett v. United States*, 102 F.3d 486, 488-89 & n.1 (11th Cir. 1996); *Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990) (per curiam) ("State law . . . governs the question of whether the United States has waived its sovereign immunity against liability . . . ."); *see also Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 723 (7th Cir. 2012) (determining that the specific state law cause of action is "a threshold issue" upon which subject matter jurisdiction depends); *Gould Elec. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000).

Although the Government did not raise this issue in its first motion to dismiss, it did so in its second motion.  The Government noted that, based on Plaintiffs' factual allegations, any state tort on which it relied would have to exist either under the laws of Texas (where the alleged investigative failures occurred)

18

or the District of Columbia (where the SEC is headquartered).  The Government

also noted that, absent some special relationship between the parties, "neither

jurisdiction recognizes any duty on the part of a private individual to act for the

protection of another or to prevent harm by a third person."

Notwithstanding this argument by the Government, the district court did not

address this matter in its order dismissing Plaintiffs' notification claim.  Nor do the

parties address the state law cause of action requirement in this appeal.  But to the

extent that the failure to provide a pertinent state tort analogue robs a plaintiff of

subject matter jurisdiction under the FTCA, it appears that Plaintiffs would face

some uphill sledding in trying to find such an analogue here.

First, adopting the approach of the Restatement (Second) of Torts, neither

Texas nor the District of Columbia requires a person to act to prevent harm to

others, absent some special relationship.  *Torrington Co. v. Stutzman*, 46 S.W.3d

829, 837 (Tex. 2000) (citing Restatement (Second) of Torts § 314 (1965)); *Feirson

v. Dist. of Columbia*, 506 F.3d 1063, 1068-69 (D.C. Cir. 2007) (same).[5]  Again

following the Restatement, neither jurisdiction generally requires a person to

prevent a third party from causing harm.  *Greater Houston Transp. Co. v. Phillips*,

---

[5]  Under the Restatement, the recognized "special relations" arise between (1) common carriers to passengers, (2) innkeepers to guests, (3) possessors of land held open to members of the public, and (4) custodians to their wards.  Restatement (Second) of Torts § 314A (1965).  The relationship of the SEC to investors does not appear to fit into any of these classes.

19

801 S.W.2d 523, 525 (Tex. 1990) (citing Restatement (Second) of Torts § 315

(1965)); *Skeen v. Federative Republic of Brazil*, 566 F. Supp. 1414, 1419 (D.D.C.

1983) (same).[6]  Also in line with the Restatement, neither jurisdiction permits

recovery through a negligence action for purely economic losses absent some

special relationship between the parties.  *Jones v. Hartford Life and Acc. Ins. Co.*,

443 F. Supp. 2d 3, 7 n.4 (D.D.C. 2006) (requiring an "intimate nexus" between the

parties); *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 898 (Tex. Ct. App.

2001); *see also* Restatement (Second) of Torts § 323 (1965).  Moreover, with

regard to liability arising from voluntary ("Good Samaritan") undertakings, Texas

requires that the plaintiff establish both reliance and an increased risk of harm.

*Torrington Co.*, 46 S.W.3d at 838 n.7; *see also Colonial Sav. Ass'n v. Taylor*, 544

S.W.2d 116, 119–20 (Tex. 1976) (noting that Texas follows the Restatement

(Second) of Torts § 323 (1965) on voluntary-undertaking liability).  Plaintiffs here

have expressly denied reliance in their notification claim.

It therefore seems questionable whether Plaintiffs could show, for either

Texas or the District of Columbia, the existence of a tort cause of action against a

---

[6]  Under the Restatement, there is a duty to prevent another from causing harm in these relationships:  (1) parents and children, (2) masters and servants, (3) possessors of land or chattels and their licensees, (4) those in charge of persons with dangerous propensities and those dangerous persons, and (5) custodians and wards.  Restatement (Second) of Torts §§ 316–320 (1965).  Again, none of these appear analogous to the relationship between the SEC and Stanford Group.

20

private person under the circumstances alleged by Plaintiffs here.  We are reluctant to decide the case on this ground, however because neither party has briefed the matter.  Accordingly, were the absence of a state tort analogue the only potential obstacle to the existence of subject matter jurisdiction here, we would be inclined to remand the case to the district court for the latter to rule, in the first instance, on this question.  But that is not necessary because the district court did find the absence of subject matter jurisdiction based on a second ground that the parties have litigated.  And because we agree with the district court that the discretionary function exception and the misrepresentation exception do apply here to negate the waiver of sovereign immunity that might otherwise arise from the FTCA, we resolve the case on that ground.  We turn to these § 2680 exceptions now.

### D.    Exceptions to Waiver of Sovereign Immunity

As noted, when either the discretionary function exception or the misrepresentation exception applies, there is no waiver of sovereign immunity under the FTCA.  *See* 28 U.S.C. § 2680(a), (h).  These exceptions "must be strictly construed in favor of the United States" and, when an exception applies, a court will lack subject matter jurisdiction over the action.  *JBP Acquisitions*, 224 F.3d at 1263–64.  We turn now to examine whether the above exceptions apply here.

21

1.    Plaintiffs' Registration Claim

In support of their registration claim, Plaintiffs argue that 15 U.S.C. § 80b-3(c) imposed on the SEC a duty to revoke Stanford Group's registration as a broker-dealer once it had determined that Stanford Group was involved in a Ponzi scheme. The district court rejected this claim on two grounds. First, it concluded that Plaintiffs had misread § 80b-3(c). The court held that, although this statute may impose certain duties on the SEC in its review and approval of an *initial* registration application by a broker-dealer, it did not impose those same duties with regard to a broker-dealer's subsequent registration amendments. Because only registration amendments, not the initial registration, were at issue here, the district court concluded that Plaintiffs had failed to articulate an applicable duty of the SEC. Second, the district court held that, even assuming a duty by the SEC to similarly review registration amendments, any actions taken, or not taken, after that review would be discretionary and therefore barred by the discretionary function exception.

*a.    Duties Pertaining to Registration Amendments*

Analysis of the merits of the district court's first ground for dismissal focuses on the question whether 15 U.S.C. § 80b-3(c) imposes not only a duty to disallow initial registration by a broker-dealer who makes a material misstatement

22

or is otherwise disqualified, but also a duty to take adverse action against an advisor at a later time when the latter amends his registration.[7]  Because Plaintiffs allege nothing amiss about the Stanford Group's initial 1995 registration, the registration claim was properly dismissed if the statutory duty applies only to an initial registration.  If, on the other hand, the duty also applies to registration amendments, then Plaintiffs have potentially made out a registration claim, and we would then have to determine whether the discretionary function exception would apply to that claim.

So, as to the question whether 15 U.S.C. § 80b-3(c) imposes on the SEC the duty that Plaintiffs attribute to it, the answer is no.  The title of § 80b-3(c) is "Procedure for registration; filing of application; effective date of registration; amendment of registration."  It has two subsections.  The first, § 80b-3(c)(1), sets out the documentation an applicant must submit to the SEC when applying for broker-dealer registration.  The second, § 80b-3(c)(2), mandates that, within 45 days of filing, the SEC must either grant a registration application or institute proceedings on that application.  The provision further sets out the criteria that the SEC should use in determining whether to grant or deny registration:

---

[7]  Once registered, a broker-dealer is required to submit an annual, amended update to the Form ADV submitted at the initial registration.  17 C.F.R. § 275.204-1 (2011).

23

> The Commission shall grant such registration if the Commission finds that the requirements of this section are satisfied and that the applicant is not prohibited from registering as an investment advisor under section 80b-3a of this title.  The Commission shall deny such registration if it does not make such a finding or if it finds that if the applicant were so registered, its registration would be subject to suspension or revocation under subsection (e) of this section.

15 U.S.C. § 80b-3(c)(2).  Spelled out, the statute tells the SEC that it should grant the applicant's registration if all requirements under the section are satisfied and if the applicant is not otherwise prohibited on grounds set out in § 80b-3a.  Conversely, the SEC should deny registration if it does not make the findings necessary to grant the application or if the registration would be subject to suspension or revocation under § 80b-3(e), had it already been granted.

The problem with Plaintiffs' argument that § 80b-3(c)(2) imposes upon the SEC certain duties at the time of the amendment of an existing registration is the absence of any mention of that fact in its text.  It is true that the phrase "amendment of registration" is in the title of § 80b-3(c), but that isolated reference is the only time the phrase is used.  The language of the section consistently refers to "granting" or "denying" registration, which are words that imply an initial application, rather than an amendment to an existing application.  Further, the text contains no discussion of procedures or duties assigned to the SEC were it required to consider suspension or revocation at the time of the filing of an amended

24

registration. Indeed, the only time that § 80b-3(c) mentions suspension or revocation of an existing registration is when it refers to a different statute, § 80b-3(e), as the statute that sets the standard for such action.[8]

With the absence of any reference to revocation or suspension of an entity's registration at the time of an amendment of that registration, Plaintiffs are left with only a policy argument: that this Court should nonetheless expand the SEC's responsibilities under § 80b-3(c) to impose, with regard to a registration amendment, the same duties that the SEC is directed to perform at the time of initial registration. Failure to do so, Plaintiffs argue, would mean that "investment advisors that the SEC knew were in violation of Federal securities laws [could] remain registered, virtually indefinitely."

Leaving aside the fact that a court has no power to rewrite a statute in response to a persuasive policy argument, Plaintiffs' concerns are nonetheless overstated because, as § 80b-3(c)(2) clearly contemplates, the SEC maintains the authority to suspend or revoke an existing registration under § 80b-3(e) if it is "in

---

[8] Section 80b-3(e) bears the title "Censure, denial, or suspension of registration; notice and hearing." It requires the SEC to take action up to and including the revocation of registration if "it finds, on the record after notice and opportunity for hearing, that such censure, placing of limitations, suspension, or revocation is in the public interest." 15 U.S.C. § 80b-3(e).

Notably, Plaintiffs have not proceeded under this § 80b-3(e), which is the subsection that addresses revocation of an entity's registration.

25

the public interest."[9]  In addition, the SEC has discretionary authority to pursue

violations of the securities laws under other statutory provisions and regulations.[10]

Thus, the SEC's power to suspend reckless or dishonest broker-dealers does not

depend on the forced reading of § 80b-3(c) advocated by Plaintiffs.

But even if we could assume that the duties described in § 80b-3(c) were

deemed to apply to amendments to registration, we would still have to determine

whether the discretionary function exception would apply to shield the SEC from

liability.  Unfortunately for Plaintiffs, the description of the SEC's duties in § 80b-

3(c) falls short of the specificity that would be required to escape the discretionary

function exception.  To understand why this is so, an explanation of that exception

is necessary.

> b.    *Impact of the Discretionary Function Exception on*
> *Plaintiffs' Registration Claim*

As noted, while the FTCA, as a general matter, waives the federal

government's immunity from suit as to certain tort claims, Congress has created

---

[9]  Plaintiffs do not contend that § 80b-3(e) has been violated.  Nor do their pleadings offer any basis for concluding that the SEC failed in any duty set by § 80b-3(e), because the latter predicates suspension or revocation on a finding, made after notice and opportunity for hearing, that such adverse action would be in the public interest.  Plaintiffs' allegations here concern internal, non-public determinations of the SEC, not findings made after a hearing.

[10]  *See, e.g.*, 15 U.S.C. § 78u(a)(1) ("The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate [securities laws]."); 17 C.F.R. § 202.5(a) ("The Commission may, in its discretion, make such formal investigations . . . as it deems necessary to determine whether any person has violated, is violating, or is about to violate . . . the federal securities laws . . . .").

exceptions to that general waiver of immunity.  One of those exceptions, known as

the discretionary function exception, provides that the provisions of the FTCA

shall not apply to:

> (a)  **Any Claim** based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or **based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused**.

28 U.S.C. § 2680(a) (emphasis added).

In short, the discretionary function exception serves to preserve sovereign

immunity for any claim that is based on a federal agency or employee's

performance or nonperformance of a discretionary task, even if, in so acting, the

agency employee may have abused his discretion.  *See* 28 U.S.C. § 2680(a);

*Nguyen v. United States*, 556 F.3d 1244, 1251 (11th Cir. 2009).  Thus, this

exception "marks the boundary between Congress' willingness to impose tort

liability upon the United States and its desire to protect certain governmental

activities from exposure to suit by private individuals."  *United States v. S.A.*

*Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808

(1984); *accord Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The

27

province of the court is . . . not to enquire how the executive, or executive officers, perform duties in which they have a discretion.").

In guiding the courts' application of the discretionary function exception, the Supreme Court has formulated a two-part test.  First, the conduct that forms the basis of the suit must involve an element of judgment or choice by the employee. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *Autery v. United States*, 992 F.2d 1523, 1526–28 (11th Cir. 1993).  In determining whether judgment or choice is present in the particular conduct at issue, the inquiry focuses on "whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner."  *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997) (internal quotation marks omitted).  If a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, the Government will have failed to show that the action at issue allowed for the employee's exercise of judgment or choice because, in that case, "the employee ha[d] no rightful option but to adhere to the directive."  *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal quotation marks omitted).  Conversely, unless a "federal statute, regulation, or policy specifically prescribes a course of action embodying a fixed or readily ascertainable standard," it will be presumed that the

28

particular act involved an element of judgment or choice. *Autery*, 992 F.2d at 1529 (internal quotation marks, citation, and emphasis omitted).

If the Government has met this first element of the test for applying the exception, then the second part of the test requires the court to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. A particular decision will be of the kind protected by the exception if it is the type of decision that one would expect to be inherently grounded in considerations of policy. *Autery*, 992 F.2d at 1530–31. Indeed, when a government agent is permitted to exercise discretion in making a particular decision—whether that permission is express or implied—"it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324; *accord OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002). Finally, in examining whether an employee's discretion is of the type grounded in public policy, one uses an objective test, and the employee's subjective intent is irrelevant. *Gaubert*, 499 U.S. at 325; *accord Mid-S. Holding Co., Inc. v. United States*, 225 F.3d 1201, 1207 (11th Cir. 2000); *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) ("Those labels [of 'malicious and bad faith conduct'] do nothing for [plaintiff's] cause, though . . . [because] subjective intent is irrelevant to our analysis.").

We now apply the above standard to the case before us.  We agree with the district court that even if one could somehow intuit from § 80b-3(c) the existence of some undescribed duties imposed on the SEC with regard to amended registration submissions, the discretionary function exception would immunize the Government from liability based on a faulty performance of those duties.  First, because the decision whether to deny an original registration application involves an element of judgment or choice, likewise so would a decision regarding the appropriate response to an amended registration.  Second, Plaintiffs have identified no federal statute, regulation, or policy that sets a "fixed or readily ascertainable standard" by which to gauge the adequacy of the employee's rendering of this decision.  To the contrary, the language of § 80b-3(c) provides no standard at all by which the SEC should make findings that underpin a decision to deny an application at the time an amended registration is filed.  The language provides that the Commission "shall grant such registration if the Commission finds that the requirements of this section are satisfied and that the applicant is not prohibited from registering as an investment advisor under section 80b-3a of this title" and the Commission "shall deny such registration if it does not make such a finding."  15 U.S.C. § 80b-3(c)(2).[11]  Here, the Commission made no finding at all on either

---

[11] Even the use of "shall" in the statutory text is not sufficient to take the action out of

30

score because it was understandably not on notice that this section even authorized

it to take a particular action on an amended registration submission.[12]  Thus, there

was no "fixed or readily ascertainable standard" that would have guided it on this

matter.

The SEC having met the first prong of the test for applying the exception,

we proceed to the second prong:  whether the employee's duties were of the type

that the discretionary function exception was intended to protect.  As set out above,

the exception is intended to protect any decision grounded in public policy, and all

discretionary decisions are presumed to be grounded in public policy.

As the Supreme Court explained in the context of the regulation of savings

and loan associations:

the discretionary function exception. *See Ochran v. United States*, 117 F.3d 495, 500–01 (11th Cir. 1997) ("*Ochran I*") ("We agree with the Government that the use of the word 'shall' in describing the responsibilities of the AUSA does not necessarily mean that the Guidelines left no room for the AUSA to exercise judgment or choice" because the Guidelines did not specify how, when, or under what circumstances action was necessary.); *Powers v. United States*, 996 F.2d 1121, 1125 (11th Cir. 1993) (holding that "shall" not dispositive where "Congress has not specifically prescribed a course of action.").

[12]  Plaintiffs did not proceed on the statutory section that actually authorizes the SEC to suspend the registration of a broker-dealer:  § 80b-3(e).  Perhaps they declined to so proceed because the latter section permits suspension only when the Commission has made the required findings on the record after notice and an opportunity for a hearing.  Because the decision to convene a hearing is obviously a discretionary judgment that would trigger application of the discretionary function exception, Plaintiffs' reluctance to rely on what would seem to be the apt statutory provision for purposes of suspension of a registration is perhaps understandable.  In any event, during the time period in question, no hearing was ever held by the SEC to consider suspension of Stanford Group.

31

> Where Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end . . . **the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected** [by the discretionary function exception.]

*Gaubert*, 499 U.S. at 323 (emphasis added).

The SEC is an independent agency, created by the Securities Exchange Act of 1934 to regulate the securities markets and protect investors through its enforcement of that and other statutes. *See* 15 U.S.C. § 78d.[13] Its regulation of the securities markets clearly involves the kinds of decisions "we would expect inherently to be grounded in considerations of policy." *Autery*, 992 F.2d at 1530–31 (internal quotation marks omitted); *Baer v. United States*, 722 F.3d 168, 175 (3d Cir. 2013) (noting that "there is a strong presumption that the SEC's conduct is

---

[13] As Congress explained in that statute:

> [T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, . . . to require appropriate reports to remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions[.]

15 U.S.C. § 78b.

32

susceptible to policy analysis"); *see also Schmidt v. United States*, 198 F.2d 32, 36 (7th Cir. 1952) (holding that SEC's investigations are "clearly within the scope of its discretionary authority"); *Sprecher v.Von Stein*, 772 F.2d 16, 18 (2d Cir. 1985) (same). Indeed, as the Supreme Court has recognized, the legislative history of the discretionary function exception indicates that it was "designed to preclude application of the [FTCA] to a claim based upon an alleged abuse of discretionary authority by a regulatory or licensing agency—for example, the Federal Trade Commission, the Securities and Exchange Commission, the Foreign Funds Control Office of the Treasury, or others." *Varig Airlines*, 467 U.S. at 809 (quoting the statement of Assistant Attorney General Francis M. Shea) (internal quotation marks omitted). That being so, investigatory decisions by the SEC are the types of decisions that the discretionary function exemption would be expected to shield.

Agreeing on this point, two of our sister circuits have recently applied the discretionary function exception to preclude claims based on the SEC's failure to discover, investigate, and dissolve other Ponzi schemes. In *Dichter-Mad Family Partners, LLP v. United States*, 709 F.3d 749, 750–51 (9th Cir. 2013), the Ninth Circuit affirmed the dismissal of a complaint made by plaintiffs who lost money in the Bernard Madoff Ponzi scheme. Laying out a long history of SEC failures to identify and upset Madoff's scheme, the plaintiffs alleged a breach of the SEC's

33

duties to investigate violations of the securities laws. *Id.* at 756–60. The Ninth Circuit rejected the plaintiffs' argument on the ground that the discretionary function exception covered the actions taken (and not taken) in the course of the investigation. *Id.* at 787. The court noted that, despite the presence of some statutory duties couched in mandatory language, the weight of the complaint involved poor performance of discretionary actions. *Id.* at 751 (quoting *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.")).

Similarly, in *Baer*, the Third Circuit dismissed a suit by plaintiffs injured in the Madoff scheme that was premised on the incompetence of the SEC's investigations. 722 F.3d at 171–72. As in *Dichter-Mad*, the *Baer* plaintiffs identified various regulatory duties framed in mandatory language, and contended that those constituted a mandatory directive. *Id.* at 173–74. The court pointed out:

> The regulations identified . . . do not prescribe any particular course of action for the SEC to follow. At most, these regulations attempt to limit the scope of discretion afforded the SEC during the course of an investigation. While a violation of these regulations may amount to an abuse of discretion, that is not sufficient to waive the federal government's sovereign immunity . . . .

*Id.* at 175 (citation omitted). On that basis, the Third Circuit also held that the discretionary function exemption applied. *Id.* at 177.

34

As *Dichter-Mad* and *Baer* emphasize, the duties that Plaintiffs' registration identify as being breached are duties that fall with the discretion of the SEC.  As such, we hold that, in the unlikely event that § 80b-3(c) authorized the SEC to revoke a registration based on a subsequent amendment, the discretionary function exception would apply, and Plaintiffs' registration claim would fall.

2.    Plaintiffs' Notification Claim

a.    *The SEC's Statutory Duty to Notify SIPC of Stanford Group's Financial Difficulties*

Plaintiffs also claim that the SEC was required by statute to notify SIPC that Stanford Group was in financial difficulty.  SIPC is a non-profit corporation with which Stanford Group, as a registered broker-dealer, was required to maintain membership.  Once notified that a member is in financial difficulty, SIPC can, among other things, file an application for a protective decree against that member in a court of competent jurisdiction.  *See* Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa-*lll*; 15 U.S.C. §§ 78eee(a)(3)-(4), (b).  The specific statutory duty upon which Plaintiffs rely provides:

> **If the Commission** or any self-regulatory organization **is aware of facts which lead it to believe that any broker or dealer subject to its regulation is in or is approaching financial difficulty**, **it shall immediately notify SIPC**, and, if such notification is by a self-regulatory organization, the Commission.

35

15 U.S.C. § 78eee(a)(1) (emphasis added).  As noted, despite indications that Stanford Bank was running a Ponzi scheme, the SEC let twelve years pass before taking any public action.  Plaintiffs contend that had the SEC earlier notified SIPC, the latter might have taken action to protect existing and future investors.  It is from this failure to act, in alleged violation of § 78eee(a)(1), that Plaintiffs have derived their notification claim.

### b.    Interplay Between the SEC's Duty to Notify and the Misrepresentation Exception

Whether or not the SEC violated § 78eee(a)(1)'s provision requiring it to notify SIPC of Stanford's financial issues, the Government contends that it is protected from liability through the misrepresentation exception.  Like the discretionary function exception, the misrepresentation exception preserves the United States' sovereign immunity and thereby protects the Government from tort liability that it might otherwise face under the FTCA.  The district court concluded that the misrepresentation exception applies, and it dismissed Plaintiffs' notification claim.  We agree.

The misrepresentation exception is set out in 28 U.S.C. § 2680(h).  That section provides a list of torts for which there can be no waiver of sovereign immunity.  Specifically,

36

**The provisions of this chapter** [Chapter 171] **and section 1346(b)** of this title **shall not apply to —**

….

(h)   **Any claim arising out of** assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, **misrepresentation**, deceit, or interference with contract rights . . . .

28 U.S.C. § 2680(h) (emphasis added).

The phrase "arising out of" is interpreted broadly to include all injuries that are dependent upon one of the listed torts having been committed. *United States v. Shearer*, 473 U.S. 52, 55 (1985) ("Section 2680(h) does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery.") (emphasis in original). So, a claim will be deemed to have arisen from a § 2680 excepted tort if the governmental conduct that is essential to the plaintiff's cause of action is encompassed by that tort. And this is so even if the plaintiff has denominated, as the basis for the cause of action, a tort not found within § 2680(h)'s list of excepted torts. *See Metz v. United States*, 788 F.2d 1528, 1534 (11th Cir. 1986)); *accord O'Ferrell v. United States*, 253 F.3d 1257, 1266 (11th Cir. 2001); *Atorie Air, Inc. v. Fed. Aviation Admin.*, 942 F.2d 954, 958 (5th Cir. 1991); *see also Shearer*, 473 U.S. at 55 (noting, in discussing the battery exception, that "[n]o semantical recasting of events can alter the fact that the battery was the immediate cause of Private Shearer's death and, consequently, the basis of respondent's claim").

37

Accordingly, it is "the substance of the claim and not the language used in stating it which controls." *Gaudet v. United States*, 517 F.2d 1034, 1035 (5th Cir. 1975).[14]  And if the governmental conduct that is essential to proving a plaintiff's claim would be covered by the misrepresentation exception, then the Government is shielded from liability by sovereign immunity, no matter how the plaintiff may have framed his claim or articulated his theory.  In other words, "a plaintiff cannot circumvent the misrepresentation exception simply through the artful pleading of its claims." *JBP Acquisitions*, 224 F.3d at 1264.  Instead, the misrepresentation exception applies "when the basis for the . . . action is an underlying claim for misrepresentation." *Id.*

So, then how does one define a claim of misrepresentation for purposes of determining whether the misrepresentation exception applies?  The Supreme Court has characterized "misrepresentation" as being a breach of the "duty to use due care in obtaining and communicating information upon which [another] may reasonably be expected to rely in the conduct of his economic affairs." *United States v. Neustadt*, 366 U.S. 696, 706 (1961).  Accordingly, "the essence of an action for misrepresentation, whether negligent or intentional, is the

---

[14]  In *Bonner v. City of Prichard, Ala.*, we held "that the decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit."  661 F.2d 1206, 1207 (11th Cir. 1981).

communication of misinformation on which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983). Collapsing the above guidance into one inquiry, we therefore examine Plaintiffs' notification claim to determine if the latter is based on the communication or miscommunication of information upon which others might be expected to rely in economic matters. If it does, and if a flawed communication caused the Plaintiffs' injury, then Plaintiffs' claim will be construed as a misrepresentation claim for which the analogous exception under § 2680(h) applies, and sovereign immunity will therefore bar the claim.

### c.    Application to Plaintiffs' Notification Claim

As the statutory basis for their notification claim, Plaintiffs rely on 15 U.S.C. § 78eee(a)(1), which states that "[i]f the [SEC] is aware of facts which lead it to believe that any broker or dealer subject to its regulation is in or is approaching financial difficulty, it shall immediately notify SIPC." The Plaintiffs allege that the SEC was aware that Stanford Group was in or approaching financial difficulty and that, through its longstanding silence, the SEC violated its statutory duty to notify SIPC of this fact. Thus, Plaintiffs do not fault the SEC for a miscommunication regarding Stanford Group's solvency; they fault the SEC for its non-communication of information regarding that issue.

39

But unfortunately for Plaintiffs, miscommunication and non-communication yield the same result for purposes of the misrepresentation exception, because the misrepresentation exception "encompasses failure to communicate as well as miscommunication."  *JBP Acquisitions*, 224 F.3d at 1265 n.3 (citing *Neustadt*, 366 U.S. at 706-07); *Muniz-Rivera v. United States*, 326 F.3d 8, 13 (1st Cir. 2003) (citing *JBP Acquisitions*, 224 F.3d at 1265) ("The case law makes manifest that the prophylaxis of the misrepresentation exception extends to failures of communication."); *Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir. 2003) (citing *Neustadt*, 366 U.S. at 705-06) ("The misrepresentation exception shields government employees from tort liability for failure to communicate information, whether negligent, or intentional.").

Therefore, because Plaintiffs' claim is focused on non-communication of financial information by the SEC, the misrepresentation exception springs into action to prevent a waiver of the Government's sovereign immunity.  Resisting this seemingly straightforward application of the misrepresentation exception, however, Plaintiffs attempt to analogize their facts to cases in which courts have refused to apply the misrepresentation exception even when there has been a miscommunication or non-communication by the governmental actor.  As we explain, Plaintiffs' cited cases are distinguishable.

40

Addressing first those cases in which courts have refused to apply the misrepresentation exception to claims asserting pecuniary loss, even when a misrepresentation by the governmental agency has occurred, it is true that the misrepresentation exception "does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." *Block v. Neal*, 460 U.S. 289, 297 (1983); *JBP Acquisitions*, 224 F.3d at 1265 (same). In *Block*, a governmental agency oversaw the construction of the plaintiff's house, but the construction turned out to be shoddy. *Block*, 460 U.S. at 297. The agency conducted three inspections throughout the project and represented that the construction met appropriate standards, but the agency's statement was wrong. *Id.* at 292, 296. Eventually learning that she had purchased a lemon, the plaintiff-homeowner sued.

Holding that the misrepresentation exception did not apply, the Supreme Court acknowledged that the governmental agency had made misrepresentations to the plaintiff when it provided inaccurate inspection reports. Yet, the Court noted, the plaintiff was proceeding under a state law Good Samaritan cause of action on a claim that the agency had voluntarily undertaken supervision of the construction. *Id.* at 297. Such a claim does not fall within the tort of misrepresentation. Further, while the agency may have made misrepresentations to the plaintiff, through

41

erroneous inspection reports, it was the negligent oversight of the construction of the home that allegedly caused the injury, and such a claim is not barred by the misrepresentation exception.  *Id.* at 298.

The Supreme Court contrasted the facts in *Block* with those at issue in *United States v. Neustadt*, 366 U.S. 696 (1961), a home construction case in which the Court had held that the misrepresentation exception did apply.  In *Neustadt*, the plaintiffs had relied on a federal agency's erroneous appraisal of a house, and, as a result, paid more than it was worth.  *Id.* at 700–01.  Although plaintiffs alleged that the basis of their claim was the agency's negligent inspection of the house, the Supreme Court concluded that the claim actually arose from a contention that the agency had made a misrepresentation.  As such, the claim was barred by the misrepresentation exception.  *Id*. at 711.

Reconciling its holding in *Block* with its earlier holding in *Neustadt*, the Supreme Court noted that the only basis for the *Neustadt* action was a claim that the federal agency had made a misstatement.  With only a misstatement claim, the misrepresentation exception necessarily applied.  But the claim in the *Block* action had rested not on the agency's duty to make accurate communications, but instead on a different duty:  its duty to use due care in supervising a construction project.

42

Accordingly, the misrepresentation exception did not apply in *Block*. *Block*, 460 U.S. at 296-97.

In short, if a plaintiff can show that the Government has breached a duty distinct from the duty not to make a misrepresentation and if that breach has caused the plaintiff's injury, the fact that the Government may have also made a misrepresentation will be insufficient to trigger the misrepresentation exception to a waiver of sovereign immunity. As the Ninth Circuit has explained, "[t]he Government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved. It is not liable, however, for injuries resulting from commercial decisions made in reliance on government misrepresentations." *Guild v. United States*, 685 F.2d 324, 325 (9th Cir. 1982).

Relying on the reasoning of *Block*, Plaintiffs liken their claim to cases in which courts have refused to apply the misrepresentation exception to bar claims of economic loss. But in those cases, as with *Block*, courts have identified some separate duty—usually referred to as an "operational" duty—that is both distinct from the duty to communicate and essential to the plaintiff's claim. For example, in *JM Mechanical Corporation v. United States*, 716 F.2d 190, 191 (3d Cir. 1983), the plaintiff, a construction subcontractor, was left unpaid when the general

43

contractor had failed to secure performance bonds required by the Department of Housing and Urban Development ("HUD").  After learning that the contractor had failed to acquire the bonds, HUD then failed in its own duty to obtain such bonds, and it also misrepresented to the subcontractor that the contractor had acquired the bonds.  *Id.* at 191-92.  The Third Circuit held that the essence of the claim was "the failure of the government to secure new bonds, not . . . the government's failure to tell [the subcontractor] of the failure of the original bonds."  *Id.* at 195.  That is, like *Block*, the sufficient cause of the injury was the breach of a duty that was distinct from the duty not to miscommunicate.  A subsequent and collateral misrepresentation that merely aggravated the injury did not suffice to invoke the misrepresentation exception.

Along similar lines are cases cited by Plaintiffs that involve the mishandling of records.  In these cases, a plaintiff was denied a benefit because the government misdelivered or misfiled some essential document.  *See, e.g.*, *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 511-13 (5th Cir. 2000) (plaintiff was denied insurance benefits because the government incorrectly filed an insurance beneficiary form that lacked the proper signature to make it effective); *Devlin v. United States*, 352 F.3d 525, 527-28 (2d Cir. 2003) (Postal Service failed to forward an employee's life insurance beneficiary form to the Office of Personnel Management, a failure

44

that subsequently deprived the beneficiary of the policy benefits).  Yet, in both

*Atkins* and *Devlin*, the cause of the plaintiff's injury was the clerical error itself,

which "operational" act did not trigger application of the misrepresentation

exception.  The agency's subsequent failure to disclose its error to the plaintiff did

not change the fact that it was the "operational" act that was the basis for the

plaintiff's claim.[15]

The cases cited by Plaintiffs are therefore distinguishable from this case.

The poor supervision of the construction project in *Block*, the failure to secure

construction bonds in *JM Mechanial*, and the filing errors in *Atkins* and *Devlin*

were all <u>acts</u> of the governmental agency and it was these acts that caused the

injuries the plaintiffs suffered.  Even though subsequent failures to notify the

plaintiffs of the agency's misdeeds may have aggravated the problems, the

economic injuries suffered by the plaintiffs in those cases did not "arise out of" any

misrepresentation by the agency.

---

[15]  Indeed, in *Atkins*, the Fifth Circuit held that the evidence, in the light most favorable to the plaintiff, suggested that the deceased had signed the designation of beneficiary form and that the personnel department of the federal agency had simply misplaced that form.  A breach of that duty constituted the breach of an operational task.  The court indicated that if instead the evidence had indicated that there was no signed form, but the personnel department had failed to communicate to the deceased the need to sign the form, then the case might well be covered by the misrepresentation exception.  *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 512-13 (5th Cir. 2000).

45

In contrast, Plaintiffs' injuries here arose precisely from the SEC's failure to notify SIPC. As Plaintiffs allege, it was this notification that "would have set in motion a process through which the [Plaintiffs] would have learned of the Ponzi scheme and been able to avoid or mitigate their damages." Thus, it was the SEC's failure to communicate particular information to SIPC that led to Plaintiffs' economic injuries. And, to repeat, a miscommunication or failure to communicate, in this context, gives rise to the misrepresentation exception.

Faced with this grim reality, Plaintiffs attempt to transform the SEC's duty to notify SIPC into an "operational" task devoid of any communicative aspect. Plaintiffs argue that they are not faulting the SEC for the substance, or absence of substance, of any particular communication. In fact, Plaintiffs go so far as to assert that "the content of the communication [to be sent to the SIPC] is immaterial to the claim." Instead, Plaintiffs argue that, as in *Atkins* and *Devlin*, where the mere presence of the right form in the right place would have sufficed to prevent the plaintiffs' injuries, the SEC merely had to complete the physical act of sending something, anything, to SIPC. Accordingly, Plaintiffs argue, the SEC's failure to perform this "operational" act takes this case outside of the misrepresentation exception.

46

But this argument makes no sense at all.  Obviously, it is the content of any writing sent to SIPC that would be critical to that corporation's determination of the appropriate action to take, not the fact that SIPC's mailroom may have happened to log in some undescribed communication from the SEC.  The district court rejected Plaintiffs' effort to end-run the misrepresentation exception with this semantical sleight-of-hand, and so do we.[16]

Finally, Plaintiffs also try to analogize their case to cases where courts have held that the duty to warn is not covered by the misrepresentation exception.  However, the misrepresentation exception did not apply in these "duty to warn" cases cited by Plaintiffs cite because the injuries involved in those cases did not arise from the plaintiffs' commercial decisions based on the governments' misrepresentations.  *See, e.g., Mandel v. United States*, 793 F.2d 964, 967 (8th Cir. 1986) (park ranger recommended a body of water for swimming, but negligently failed to warn the swimmer of submerged rocks, upon which the swimmer then suffered a serious head injury); *McNeil v. United States*, 897 F. Supp. 309, 310-11

---

[16]  The district court noted in its order granting dismissal:

> The crucial element in the Plaintiffs' chain of causation is the alleged failure to communicate information about Stanford's company.  The Plaintiffs cannot disguise the essence of their negligent misrepresentation claim by repackaging the SEC's alleged negligence from having failed to 'notify' or 'report' . . . to having failed to send the required notification.

47

(E.D. Tex. 1995) (plaintiffs injured in a fire when the Farmer's Home Administration ("FmHA") failed to inform them that an inspection of a house the plaintiffs were purchasing had discovered a faulty smoke alarm and FmHA had failed to repair the alarm); *Lemke v. City of Port Jervis*, 991 F. Supp. 261, 263-64 (S.D.N.Y. 1998) (negligent home-safety inspectors failed to identify lead pipes, which poisoned the plaintiff).

As *Neustadt* explained, the misrepresentation exception applies to the breach of the "duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs." 366 U.S. at 706. The injury Plaintiffs suffered here was the loss of their investment money, which is an economic injury arising from a commercial decision that Plaintiffs may not have made had the SEC notified SIPC of Stanford Group's financial frailty. Thus, the failure-to-warn cases, which involve non-economic injuries, are not on point.

For all the above reasons, we conclude that the § 2680(h) misrepresentation exception applies and the Government enjoys sovereign immunity from this claim. Therefore, we affirm the district court's dismissal of the notification claim, as well as the registration claim.

## IV.    Alternative Ground For Dismissal Under Rule 12(b)(6)

We affirm the district court's dismissal of Plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1) under the assumption that the applicability of a § 2680 exceptions deprives a court of jurisdiction over tort claims made against the Government.  This conclusion is consistent with the language of § 2680 and § 1346(b), which make the jurisdictional grant of the latter section inapplicable when one of the former section's exceptions to the FTCA's waiver of sovereign immunity applies.  The Supreme Court has also expressly stated that sovereign immunity, which the § 2680 exceptions preserve, is "jurisdictional in nature."  *Meyer*, 510 U.S. at 475.  Finally, this Court has consistently treated the § 2680 exceptions as jurisdictional, as evidenced by the fact that we have considered their existence before reaching other statutory prerequisites that likewise could be said to enjoy some claim to jurisdictional status.  *See, e.g.*, *Powers v. United States*, 996 F.2d 1121, 1123 n.2 (11th Cir. 1993) (deciding that the discretionary function exception applied, and thus not addressing the argument that "the plaintiffs cannot bring this suit, because a private party would not be liable under like circumstances"); *Mesa v. United States*, 123 F.3d 1435, 1439 n.6 (11th Cir. 1997) ("In light of our conclusion that the appellants' claim is barred by the discretionary function exception, we need not address the United States' argument that the

49

appellants have failed to allege facts sufficient to support recovery under Florida law."); *Ochran v. United States*, 117 F.3d 495, 504 n.6 (11th Cir. 1997) ("*Ochran I*") (noting that the discretionary function exception is jurisdictional and stating that the Court had not yet considered the question of a valid state law claim). Other circuits have expressly agreed with this approach. *See Lesoeur v. United States*, 21 F.3d 965, 967 (9th Cir. 1994) ("[F]ederal courts do not have subject matter jurisdiction over tort actions based on federal defendants' performance of discretionary functions."); *White-Squire v. U.S. Postal Service*, 592 F.3d 453, 457-58 (3d Cir. 2010) (chapter 171 provisions are jurisdictional).

For these reasons, we affirm the district court's dismissal of these claims based on its lack of subject matter jurisdiction. That said, we also recognize that in its recent jurisprudence, the Supreme Court has become more reluctant, when sanctioning the dismissal of some claims, to base its rejection on jurisdictional grounds, as opposed to a deficiency in the merits of the claim. For example, in reversing the Second Circuit, the Supreme Court explained that the Copyright Act's requirement that copyright holders register their works before suing for infringement was not a jurisdictional prerequisite, but rather "a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010). Explaining the

50

distinction in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 254 (2010), the Court noted that whereas jurisdictional questions go to the court's "power to hear a case," merits questions ask "whether the allegations the plaintiff makes entitle him to relief." (internal quotation marks omitted).  This is a distinction with a difference, because:

> Branding a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system . . . Courts do not usually raise claims or arguments on their own.  But federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.

*Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, ___, 131 S. Ct. 1197, 1202 (2011).  That is, classifying a prerequisite to suit as jurisdictional makes it the court's responsibility to raise the issue *sua sponte* even if the parties do not address it themselves.

The FTCA has not been immune to the recent debate concerning which side of the jurisdiction/merits pendulum a particular statutory defect in a claim should lie.  Relying on the Supreme Court's holding in *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004), a case involving bankruptcy procedure, the Seventh Circuit "no longer treats § 2675(a) [which requires exhaustion of administrative claims before commencing suit under the FTCA] as a jurisdictional prerequisite."  *Smoke Shop,*

51

*LLC v. United States*, 761 F.3d 779, 786-87 (7th Cir. 2014).  We, however, have characterized this provision as jurisdictional.  *Dalrymple v. United States*, 460 F.3d 1318, 1324 (11th Cir. 2006).  More recently, the Ninth Circuit has held that the statute of limitations applicable to the FTCA, 28 U.S.C. § 2401(b), is not jurisdictional.  *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1044 (9th Cir. 2013) (en banc), *cert. granted sub nom. United States v. Kwai Fun Wong*, ___ U.S. ___, 134 S. Ct. 2873 (June 30, 2014) (decision pending).

In *Kwai Fun Wong*, the Ninth Circuit made clear that it was expressing no view on the jurisdictional status of the chapter 171 provisions of Title 28.  *Id.* at 1044 n.10.  However, in the wake of this general jurisprudential shift, the Seventh Circuit has taken the position that the statutory exceptions to the United States' waiver of sovereign immunity, found in § 2680(a)–(n), "limit the breadth of the Government's waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts."  *Parrott v. United States*, 536 F.3d 629, 634 (7th Cir. 2008).  Instead, the applicability of these exceptions goes to the plaintiff's entitlement to relief.  As a result of this conclusion, the Seventh Circuit held that it is now "the Government's burden to assert these exceptions if and when it seeks to defeat a claim because of them."  *Id.* at 634-35.

52

Nonetheless, given the texts of the applicable statutes, the general admonition by the Supreme Court that sovereign immunity is jurisdictional, and our own precedent, we will treat the § 2680 exceptions as jurisdictional in this case. We can comfortably do so because we conclude that the result of this case would be the same whether the absence of a § 2680 exception operates as a jurisdictional prerequisite or instead as a question going to the merits of Plaintiffs' claims. In *Morrison*, the Supreme Court concluded that the Second Circuit had mistakenly treated a provision of federal securities laws as jurisdictional, when it affirmed a Federal Rule of Civil Procedure 12(b)(1) dismissal. Instead, the Supreme Court concluded that, based on the same defect in the complaint, the case should have been dismissed pursuant to Rule 12(b)(6) for failure to state a claim. 561 U.S. at 253-54. The Supreme Court held that remand was unnecessary, however, because "a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion." *Id.* at 254.

We believe the same approach applies here. Should the § 2680 exceptions someday be interpreted as going to the merits of a plaintiff's claim, rather than the district court's jurisdiction to hear the case, then for the same reasons that we affirm the dismissal for lack of subject matter jurisdiction, we would also affirm for failure to state a claim upon which relief could be granted.

53

## V.    <u>Conclusion</u>

For the above reasons, we **AFFIRM** the district court's dismissal of Plaintiffs' claims.