2006 VT 74

## Harold and Edith Herbert v. Pico Ski Area Management Company and American Skiing Company, Inc. (Central Vermont Public Service Corporation, Intervenor)

[908 A.2d 1011]

No. 04-526

Present: Skoglund and Burgess, JJ., and Pearson, Supr. J., Allen, C.J. (Ret.), Gibson, J. (Ret.), Specially Assigned

Opinion Filed August 4, 2006

142

*Mary P. Kehoe* and *Christina A. Jensen* of *Lisman, Webster, Kirkpatrick & Leckerling, P.C.*, Burlington, for Plaintiffs-Appellants.

*Allan R. Keyes* and *James B. Anderson* of *Ryan, Smith & Carbine, Ltd.*, Rutland, for Intervenor-Appellee.

¶ 1. **Skoglund, J.** This case concerns the ultimate disposition of escrowed funds set aside at the closing on the sale of the Pico Mountain Ski Area. In its summary judgment ruling, the superior court awarded the escrowed funds to Central Vermont Public Service Corporation (CVPS), which was permitted to intervene in the case. On appeal, plaintiffs Harold and Edith Herbert contend that CVPS was not a third-party beneficiary of the disputed transaction and that they are entitled to the funds. We affirm the superior court's judgment.

¶ 2. The Herberts operated Pico Mountain Ski Area under a series of successive corporate entities. CVPS supplied the electricity to the ski area. In July 1996, Pico Mountain, Inc. filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Vermont, listing no significant assets and substantial unsecured debts, including a $214,802 debt for electricity owed to CVPS. While the bankruptcy case was pending, the Herberts sold the ski area's assets to American Ski Company, Inc. (ASC). The terms of the sale were set forth in a purchase-and-sale agreement dated October 16, 1996. One provision of the agreement entitled ASC to reduce the purchase price dollar for dollar by amounts needed to satisfy any liabilities identified as of the date of closing. Another subsection of the same provision required ASC to establish an escrow account containing funds for discharging liabilities already identified in a schedule attached to the

parties' agreement. That schedule did not list the $214,802 debt owed to CVPS, but the debt was listed in a closing statement signed by the parties, and ASC withheld in escrow $214,802 from the purchase price at the December 9, 1996 closing.

¶ 3. In January 1997, CVPS filed a timely proof of claim in the bankruptcy proceeding for $226,480, later amended to $286,480. During the course of that proceeding, the trustee for Pico Mountain, Inc. entered into a settlement agreement with the Herberts concerning causes of action against the Herberts personally for alleged breaches of their fiduciary duty towards the debtor, Pico Mountain, Inc. The settlement agreement required the Herberts to pay $120,000, roughly thirty percent of the allowed unsecured claims against Pico Mountain, Inc., in exchange for immunity from liability to creditors for their relationship with the debtor. In May 1997, the trustee asked the bankruptcy court to approve the settlement and enjoin the creditors from bringing any actions against the Herberts based on a derivative liability theory. CVPS was served with a summons and complaint, but never entered an appearance. The bankruptcy court approved the settlement and issued a permanent injunction in October 1997. Judgment by default was entered against CVPS in December 1997, after which CVPS received a dividend of $96,081 representing its share of the bankruptcy court's distribution to unsecured creditors.[1]

¶ 4. Following termination of the bankruptcy proceeding, the Herberts asked ASC to release the escrowed funds. ASC refused, and in September 2000 the Herberts filed an action against ASC seeking declaratory relief and an order requiring ASC to pay them all of the escrowed funds. ASC made no claim to the funds, but instead filed a motion asking that CVPS be joined as an interpleader to the action. In February 2002, CVPS moved to intervene, claiming that it was entitled

---

[1] In this appeal, the Herberts contend that the superior court erred by awarding the entire $214,802 in escrowed funds to CVPS; however, they have never argued in the alternative, either in this Court or the superior court, that even if the escrowed funds were properly awarded to CVPS, the court should have set off from that sum CVPS's $96,081 bankruptcy distribution to prevent CVPS from obtaining a windfall or "double recovery" on its utility bill. The Herberts have instead consistently pursued an "all or nothing" approach to the issue of who is entitled to the escrowed funds as a matter of law and the applicable contract language. For the reasons discussed herein, CVPS has the better legal claim, even if the Herberts might have asserted some basis for an equitable set-off. Because the Herberts make no such argument, we do not address this issue.

to the entirety of the escrowed funds. CVPS also filed a motion asking the bankruptcy court to reopen its proceeding and provide relief from its permanent injunction. In response to CVPS's motion, the bankruptcy court determined that its injunction did not bar CVPS from intervening in the state court action initiated by the Herberts, as long as CVPS took no action against funds determined by the state court to be solely the property of the Herberts.

¶ 5. Following the bankruptcy court's ruling, CVPS and the Herberts filed cross-motions for summary judgment in the superior court proceeding. In response to the motions, the superior court allowed CVPS to intervene and granted its motion for summary judgment, ruling that the parties to the purchase-and-sale agreement contemplated that the escrowed funds would cover the debt owed to CVPS as of the date of closing. In so ruling, the superior court concluded that the bankruptcy court's injunction did not dissolve the underlying debt that was to be paid through the escrowed funds, legal title to which never passed to the Herberts because they had failed to pay the CVPS bill that the funds were meant to cover, and thus had failed to satisfy the primary escrow condition.

¶ 6. The Herberts raise four arguments on appeal, none of which is ultimately persuasive. We find no merit to their first argument, which is that the superior court erred by refusing to adjudicate their right to ownership of the escrowed funds. In discussing the scope of the bankruptcy injunction and whether to allow CVPS to intervene in the Herberts' action against ASC, the superior court concluded that by allowing CVPS to intervene in the state court action, the bankruptcy court necessarily implied that the escrowed funds did not legally belong to the Herberts. That is not correct because the bankruptcy court expressly deferred to the superior court to determine who owned the funds. Nevertheless, in the main section of its decision discussing the terms of the purchase-and-sale agreement, the superior court plainly and unequivocally concluded that the Herberts never obtained ownership of the escrowed funds because they failed to pay the CVPS debt that was due at closing. According to the court, because the Herberts failed to satisfy the condition of the escrow, they could not establish ownership of the funds. As the court summarized:

> [T]he Herberts' sole claim of ownership here is an equitable title, contingent on the satisfaction of CVPS's electrical bill. We are persuaded that this contingent right does not create a right of ownership in the Herberts and leaves the escrow fund

outside of their control and ownership and, therefore, outside the protection of the bankruptcy court's injunction.

In short, the superior court did adjudicate the Herberts' right to the escrowed funds.

■ ¶ 7. Along the same lines, the Herberts argue that the superior court erred by relying on the doctrine of res judicata to support its refusal to consider their ownership of the escrowed funds. Once again, the Herberts misconstrue the superior court's decision. As stated above, although the superior court mistakenly opined that the bankruptcy court's decision to allow CVPS to intervene in the state court action was tantamount to a finding that the escrowed funds did not belong to the Herberts, later in its decision the court explicitly rejected in detail the Herberts' claims to ownership of those funds. After noting that the bankruptcy court did not foreclose CVPS from seeking payment of its electricity bill directly from ASC as long as the Herberts did not own the escrowed funds, the superior court determined that the Herberts never obtained ownership rights over the funds because they failed to satisfy the condition of the escrow. This determination is completely consistent with the bankruptcy court's conclusion that its injunction did not prevent CVPS from obtaining the escrowed funds directly from ASC as long as the state court ruled that the Herberts did not legally own the funds. Thus, we reject the Herberts' second argument because, like the first one, it is based on the faulty premise that the superior refused to consider their right of ownership to the escrowed funds.

¶ 8. Next, the Herberts argue that CVPS is barred by the doctrine of res judicata from asserting any claim against them. The Herberts assert that CVPS is essentially attempting to collect a debt from them personally by piercing the corporate veil of Pico Mountain, Inc. According to the Herberts, CVPS had a full and fair opportunity to litigate this "alter ego" theory in the bankruptcy proceeding, but failed to do so, and thus is now precluded from doing so in state court. This argument appears to be without merit because CVPS is seeking the escrowed funds from ASC, not from the Herberts. In any event, we will not consider the argument because it was not timely raised before the superior court. See *Lane v. Town of Grafton*, 166 Vt. 148, 153, 689 A.2d 455, 457 (1997) ("Failure to raise a reason why summary judgment should not be granted at the trial level precludes raising it on appeal.").

¶ 9. Lastly, the Herberts argue that the superior court erred in awarding CVPS the escrowed funds because the utility was not a third-party beneficiary to the purchase-and-sale agreement. According to the Herberts, the language of the agreement does not evince an intent by the contracting parties to benefit CVPS. In support of this argument, the Herberts point out that the CVPS debt was not listed in the initial schedule of debts attached to the agreement itself. They also note that the agreement gave them the right to "resolve" any liens and encumbrances, and that they did so with respect to the CVPS debt through the bankruptcy proceeding. The Herberts further contend that, to the extent the agreement is ambiguous, the intent of the parties was a disputed question of material fact that should have precluded the superior court from deciding the case on summary judgment.

¶ 10. We find no error in the superior court's award of summary judgment to CVPS based on the language of the agreement, which provides in relevant part:

### 4.02 *Purchase Price Adjustment.*

(a) *The Purchase Price payable to Sellers shall be reduced on a dollar-for-dollar basis by the amount necessary to deliver free, clear and unencumbered title to all Purchased Assets.* Initially, the adjustment will be made by deducting such amounts from cash payable at Closing to reflect amounts paid, incurred or required to discharge all liens and encumbrances, and satisfy all liabilities that have been identified as of the Closing Date which could mature or otherwise be perfected into or result in the establishment of a lien or encumbrance upon, or a claim to or against any of the Purchased Assets, or a claim against Buyer as the owner of the Purchased Assets.

. . . .

(c) Buyer agrees to establish at Closing, and maintain in a segregated account, an escrow to fund the liens, encumbrances and other liabilities identified in Schedule 4.02. Sellers shall be afforded an opportunity to resolve any and all disputes with respect to the liens, encumbrances and other liabilities identified in Schedule 4.02; provided, however, that *Buyer reserves the right to apply the escrowed proceeds to pay such claims and receive a discharge of any such liens, encumbrances or other liabilities at any time, and in any*

*manner, Buyer deems appropriate, in Buyer's sole discretion, in order to preserve and protect its property interest in the Purchased assets.* Sellers may not act for or on behalf of Buyer in attempting to resolve such disputes or claims, but rather shall contest, dispute or resolve such claims at Sellers' sole cost and expense and in Sellers' name. *Nothing set forth herein shall in any way prevent, prohibit or restrict Buyer from taking any action, or refraining from any action, Buyer deems necessary or appropriate to defend, protect or advance its interests with respect to such claims, whether or not consistent with Sellers' position as to such matters.*

. . . .

### 4.05 *Adjustment for Utilities.*

Sellers shall cause all meters for electricity, gas, water, sewer and other utility usage related to the Purchased Assets to be read on the Closing Date, and *Sellers shall pay all charges for all charges for such utilities which have accrued on or prior to the Closing Date.* If the utility companies are unable or refuse to read the meters on the Closing Date, all charges for such utilities to the extent unpaid shall be prorated and adjusted as of the Closing Date based on the most recent bills therefor. The Sellers shall provide notice to the Buyer within three (3) days before the Closing Date setting forth (i) whether utility meters will be read as of the Closing Date and (ii) a copy of the most recent bill for any utility charges which are to be prorated and adjusted as of the Closing Date. If the meters cannot be read as of the Closing Date and, therefore, the most recent bill is used to prorate and adjust as of the Closing Date, then to the extent that the amount of such prior bill proves to be more or less than the actual charges for the period in question, a further adjustment shall be made after the Closing Date as soon as the actual charges for such utilities are available, which Buyer shall have read as soon as possible after the Closing Date. Sellers' and Buyer's obligation to make such post-Closing Date adjustments for utilities shall survive the Closing. Sellers' obligations hereunder not funded separately by Sellers at Closing shall be deducted from cash payable to Sellers at Closing.

(Emphasis added.)

¶ 11. As the superior court found, the above provisions indicate that the contracting parties intended to reduce the purchase price by the amount of all outstanding debts still due at the closing and to assure that any unsatisfied debts would be covered by funds placed in escrow at the closing. Although the $214,802 CVPS debt was not listed in the schedule attached to the agreement, it was expressly listed in the closing statement as a 4.02 reservation held by ASC. Further, that precise amount of money, $214,802, was placed in escrow at the closing pursuant to the above provisions. Plainly, ASC reserved those funds from the purchase price to pay the CVPS debt.

¶ 12. Under the agreement, the escrowed funds were to be released to the Herberts only in the event that they resolved the CVPS debt to ASC's complete satisfaction. Obviously, ASC would not be "satisfied" until the CVPS debt was paid in full so that CVPS could make no claim against them. Because this never occurred and the bankruptcy injunction did not preclude CVPS from seeking the funds directly from ASC as the titleholder to those funds,[2] the Herberts had no legal right to the funds under the plain language of the agreement. See *Vt. Real Estate Comm'n v. Martin*, 132 Vt. 309, 315, 318 A.2d 670, 674 (1974) (lessee owned security deposit held in escrow until conditions of escrow provision were violated and dollar value of ascertained damages entitled lessor to recover any part of deposit); see also *United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 735 (8th Cir. 2001) ("Under Nebraska law, legal title remains in the grantor when funds are placed in escrow."); *Knoll v. Butler*, 675 A.2d 1308, 1312 (Pa. Commw. Ct. 1996) ("The depositor is usually the buyer who, nevertheless, retains title to the escrowed money until the performance of certain conditions or happenings of specific events (the escrow conditions)."); Restatement (Second) of Contracts § 103 cmt. b (1981) ("Where the owner of property delivers in escrow the property . . . , the title to the property does not pass until the condition has occurred . . . ."). Accordingly, the superior court did not err in concluding that the Herberts did not own the escrowed funds.

---

[2] Although the bankruptcy distribution of $96,081 may have legally "resolved" the CVPS debt vis-a-vis the Herberts and Pico Mountain, Inc., it did not resolve the debt to ASC's satisfaction so long as the possibility existed that CVPS could still seek the balance from ASC. Thus, the escrow condition was never fully satisfied by the Herberts, and ASC retained its discretionary right to "apply the escrowed proceeds" pursuant to 4.02(c) of the agreement.

¶ 13. Nor did the superior court err in considering the closing statement when interpreting the purchase-and-sale agreement. Although the terms of a contract may not be contradicted by evidence of a prior agreement or contemporaneous oral agreement, such terms may be explained or supplemented "by evidence of consistent additional terms." See 9A V.S.A. § 2-202(b). Moreover, we have recognized that the plain meaning of an agreement cannot exist in a vacuum without any consideration of "the circumstances surrounding the making of the agreement as well as the object, nature and subject matter of the writing." *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 578, 556 A.2d 81, 84 (1988).

¶ 14. Here, the plain language of the agreement indicated that the parties anticipated a period of due diligence leading to the closing, at which time an escrow account would be established to pay for any unresolved liabilities to ASC's complete satisfaction. Thus, the closing statement was an integral part of the purchase-and-sale agreement and supported the court's determination (notwithstanding the absence of the CVPS debt in the schedule attached to the agreement itself) that the parties intended the funds placed in escrow at the closing to cover the CVPS debt, particularly given that the amount of the escrowed funds matched the debt precisely. Indeed, the terms of the agreement and the circumstances at closing fully support the superior court's conclusion that, by placing $214,802 in escrow at the closing, the parties intended to assure that the CVPS debt would be completely resolved to ASC's satisfaction as contemplated under the agreement. The Herberts failed to present any disputed material facts that bring into doubt this intent, and thus the superior court did not err in granting summary judgment to CVPS based on the terms of the agreement.

¶ 15. In effect, the agreement created a third-party-beneficiary relationship that provided the basis for ASC to pay the escrowed funds to CVPS under the discretionary authority given to ASC by 4.02(c). As a practical matter, CVPS was an intended beneficiary of the purchase-and-sale agreement in that the Herberts agreed to a reduced purchase price to allow ASC to pay off in full the debt owed to CVPS if the Herberts did not do so. See Restatement (Second) of Contracts § 302(1) (1981) ("[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money

150

to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."); *Morrisville Lumber Co. v. Okcuoglu*, 148 Vt. 180, 184, 531 A.2d 887, 890 (1987) ("Whether or not a party is a third-party beneficiary is based on the intention of the original contracting parties."). Indeed, the promise to pay off another's debt may make a creditor an intended third-party beneficiary even if the duty of the promisee is unenforceable by reason of discharge in bankruptcy. Restatement (Second) of Contracts § 302 cmt. b (1981).

¶ 16. Finally, the superior court did not err in granting ASC's motion to join CVPS in the Herberts' action to protect ASC's own interest under the agreement — which was to pay off outstanding debts connected with the ski area, including the CVPS debt, so as to eliminate any potential liability to CVPS or other creditors. Allowing CVPS to intervene was consistent with the bankruptcy court's ruling that its injunction did not preclude CVPS from intervening in the superior court action and seeking reimbursement for the CVPS debt as long as the superior court found that the Herberts did not own the escrowed funds. Because we concur with the superior court's determination that the Herberts did not legally own the escrowed funds and were not absolutely entitled to those funds under the plain meaning of the purchase-and-sale agreement, we conclude that the court did not err in directing payment of the escrowed funds entirely to CVPS.

*Affirmed.*