*Sutton v. State of Vermont*, 100-5-17 Lecv (Carlson, J., Apr. 20, 2018)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Lamoille Unit | CIVIL DIVISION<br>Docket No. 100-5-17 Lecv |

| | |
|---|---|
| Antony Sutton,<br>Wei Wang,<br>Xiaofeng Feng,<br>Guangyi Xiong,<br>Robert Connors,<br>     Plaintiffs<br><br>      v.<br><br>State of Vermont Department of,<br>James Candido,<br>William Carrigan,<br>Susan Donegan,<br>Eugene Fullam,<br>Joan Goldstein,<br>John W. Kessler,<br>Lawrence Miller,<br>Patricia Moulton,<br>Michael Pieciak,<br>Brent Raymond,<br>The Vermont Regional Center,<br>State of Vermont Agency of,<br>     Defendants | DECISION ON MOTION |

The State has moved to dismiss the Plaintiffs' entire Third Amended Complaint, pursuant to V.R.C.P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to V.R.C.P. 12 (b)(6) for failure to state a claim upon which relief can be granted. Both general grounds for dismissal stand on the law of sovereign immunity and official immunity, absolute and qualified, as well as specific grounds with respect to certain of the causes of action pled. Plaintiffs have replied at length, and the State has in turn replied to the Plaintiffs' reply. In addition, the Court held oral argument on the motion on March 19, 2018. Plaintiffs are represented by the Barr Law Group and specifically Russell Barr, Esq., Chandler Matson, Esq. and Benjamin Novogroski, Esq. The State is represented by the Vermont Attorney General and specifically

_____.

Given the grounds for dismissal argued by the State, the Court's analysis must start with careful sorting of the claims made and the particular State officials against whom they are made in Plaintiffs' Third Amended Complaint ("TAC"). In doing so, the Court takes the facts alleged in the TAC as true, and otherwise its' inquiry "focuses on the absence of any facts, reasonable factual inferences, and legal bases for recovery alleged in the complaint,

attachments thereto, or to matters the court may judicially notice." *State v. Sprague,* 178 Vt. 222, 224 (2005), quoting *Gilman v. Maine Mutual Fire Insurance. Co.,* 175 Vt. 554 (2003).

The Court has previously laid out the big picture painted by the Plaintiffs in this case in the Court's Decision on Motion to Appoint Receiver dated December 5, 2017. The gist begins with the underlying economic facts. Over a close to ten year period starting in 2006, Jay Peak developers William Stenger and Ariel Quiros, acting through a variety of entities, persuaded hundreds of foreign investors to invest $500,000 each, for a total of about $400 million, in exchange for interests in the developments together with immigrant visas for themselves and their families. The federal program that authorized these investments-for-visas is known as the EB-5 program, named after the visa category under federal statute. The State's role from the beginning was to join in promotion of the investments in the name of much needed economic development in the Jay Peak/Newport region. It did so through an office within the State Agency of Commerce and Community Development ("ACCD") that received approval of the United States Customs and Immigration Service ("USCIS") to act as a Regional Center. Known as the Vermont Regional Center ("VRC"), the mission of the office was to promote economic development in Vermont by way of facilitating EB-5 investment here.

VRC and ACCD officials, and then-Governor Peter Shumlin, joined in promotion of the investments both by way of public appearances, written materials circulated to potential investors and by joining the Jay Peak principals in traveling to promotional events in the U.S. and in Asia. Written and spoken statements issued by those officials touted the "legitimacy, viability and overall accountability" of the Jay Peak projects ("JPPs"), including the benefits of State oversight that would include quarterly reviews, financial monitoring and audits to ensure project compliance with all applicable laws and regulations.

The materials prepared and presented to solicit investors included Memorandums of Understanding ("MOUs") between the State and the JPPs. Those MOUs are referred to in the TAC and their existence is undisputed by the State. The first one, signed in 2006, was also attached to Plaintiffs' motion for a receiver. It calls for the Jay Peak entity to deliver quarterly reports on its' business and financial activity with investor capital and to act "honestly, consistently and fairly" in order to assist ACCD with ACCD's "oversight and management of the Regional Center in connection with the Jay Peak Project." It does not expressly call for the State to conduct any audit of the project. The reporting and honesty obligations fell on the Jay Peak entity.

The investors relied on the State's promotional statements as well as those of the private Jay Peak principals, in making their investments and taking the giant steps of seeking to become lawful residents of the United States.

The VRC collected administrative fees of $1500-3000 from each investor, totaling some $1.6 million over the entire decade investment period and used to pay the costs of VRC operations and activity. There is no allegation that the State is currently holding any investor funds.

Concern over the actual use of investor funds surfaced in early 2012, initiated by principals of the consulting firm that the State had hired for some time to assist in the VRC

effort. That relationship ended in dispute and the consultant warning about a hundred immigration attorneys involved in EB-5 applications that the consultant had lost confidence in the financial integrity of the JPPs. The TAC alleges that the VRC response to the concerns was limited to a site visit to the JPPs by the then VRC Director, James Candido, and an immigration attorney hired by the State, that found "no issues" and continued to tout the State's ongoing oversight and audit functions. The TAC then alleges that Mr. Candido, together with higher-ups in the ACCD, retaliated against the "whistleblower" consultant by blackballing it from participating in other EB-5 projects in Vermont. Mr. Candido proceeded to reassure potential investors that the whistleblower was just a disgruntled businessman and vouched for the ongoing legitimacy and reliability of the JPPs, particularly given ongoing State oversight.

The JPPs continued, both those already in the pipeline in 2012 and more. In May of 2014, approximately two years after the initial red flags raised by the consultant, a group of investors led by Plaintiff Anthony Sutton confronted the successor VRC Director, Brent Raymond, with evidence of misuse of investor funds and an apparent effort by the Jay Peak principals to frustrate investor inquiry by way of converting their equity interests in the projects to simple debt. Mr. Raymond responded by disclaiming State responsibility for auditing the JPPs and any responsibility for assisting the investors with their complaints of mistreatment other than to convey them to the Jay Peak principals. Mr. Sutton et al continued their effort by hiring their own auditor but his effort was frustrated by delays in response from the Jay Peak principals, allegedly aided and abetted by Mr. Raymond. No private audit was ever accomplished. The investors escalated their complaint about VRC inaction to the Secretary of ACCD, Patricia Moulton, who joined Mr. Raymond in disclaiming State responsibility for any kind of audit of the JPPs.

The 2014 VRC and ACCD disclaimers of audit responsibility stand in contrast to the written and spoken assurances given to investors over the several years prior. The State was not, however, ignoring the situation. In December 2014, ACCD and the State Department of Financial Regulation ("DFR") joined forces in the VRC, adding DFR's securities regulation resources to the mix. The legislature, meanwhile, passed the first statute specifically authorizing the VRC and specifically as a joint effort of ACCD and DFR. DFR's subsequent efforts culminated in a securities fraud lawsuit against the Jay Peak principals in April of 2016 that remains pending. Remarkably, the VRC, now a joint effort of ACCD and DFR, continued to promote more EB-5 fundraising for the JPPs, even as the investigation and audit identified misappropriation of millions of dollars of investor funds by the Jay Peak principals.

The TAC does not allege any wrongdoing by DFR or DFR officials prior to it joining the VRC effort in December 2014. Instead, it focuses on allegations that "DFR's presence further contributed to the fraud" by failing to act immediately to shut down pending investment solicitation, joining in the drafting of investment offering documents "to give the false appearance of state oversight and monitoring," and joining in approval of the last two JPPs for further investment in early 2015. The chronology of DFR's entire effort, including most importantly its eventual investigation culminating in the April 2016 action against the Jay Peak principals, is not set forth in the TAC.

The TAC alleges that the various State officials involved were motivated by the notoriety of bringing hundreds of millions of dollars to Vermont's most economically depressed region,

3

desire to protect their jobs and obtain future jobs, and the lure of international travel and hospitality at Jay Peak itself.

## Claims Made

Count 1 alleges common law fraud by way of communications to Plaintiffs/investors to the effect that the Jay Peak Projects ("JPPs") were legitimate and that they could rely on the State's ongoing oversight of the JPPs in making their investment decisions. Those communications were belied by the fact that actual State oversight was too little and too late and ignored an extended series of red flags that pointed to the JPPs being as illegitimate and fraudulent as they turned out to be.

Count 2 of the TAC alleges essentially the same facts and "common plan or scheme…which operated as a fraud…upon Plaintiffs" in the context of a claim under the Vermont Securities Act, 9 V.S.A. §5501 et seq.

Counts 3 and 4 allege essentially the same facts in the context of claims for fraud under the Federal Securities and Exchange Act, 15 U.S.C.§_____.

Count 5 alleges essentially the same facts in the context of a claim of negligent misrepresentation.

Count 6 alleges essentially the same facts in the context of a claim for gross negligence/willful misconduct, adding the further characterization of those facts as creating "a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the oversight and administration of Plaintiffs' assets in the JPP…" which Defendants "grossly failed to exercise…"

Count 7 alleges essentially the same facts in the context of a claim for breach of fiduciary duty arising from the State's "superior position" to oversee the JPPs, its offering of that superior position to the Plaintiffs to rely upon, and then its failure to fulfill that duty.

Count 8 alleges essentially the same facts, adding specific reference to the Memorandums of Understanding ("MOUs") between the State and the JPPs, in the context of a claim that Plaintiffs were the intended third party beneficiaries of those agreements, the State breached those MOUs by failing to provide promised oversight, and Plaintiffs were damaged thereby.

Count 9 alleges essentially the same facts, adding specific reference to the relatively modest administrative fees of $1500-$3000 per investor paid to the Vermont Regional Center ("VRC"), in the context of a claim for unjust enrichment and a request for relief in the form of imposition of a constructive trust.

Count 10 alleges essentially the same facts as Count 9, but seeks recovery of the fees on the basis of mutual mistake as to the reality of State oversight of the JPPs.

Counts 11 and 12 allege essentially the same facts in the context of a claim of aiding and abetting the Jay Peak principals in their breach of fiduciary duty to Plaintiffs by way of committing fraud.

Count 13 alleges essentially the same facts in the context of a simple negligence claim.

Count 14 appears to be a reiteration of Count 9, for unjust enrichment, but expanding the scope of the "enrichment" to include any benefit received by way of the alleged breaches of fiduciary duty.

Count 15 alleges essentially the same facts in the context of a claim for fraud under the Vermont Consumer Fraud Act, 9 V.S.A. §2451 et. seq.

Count 16 alleges essentially the same facts in the context of a claim for breach of implied contract arising from the payment of investor fees "and other good and valuable consideration" to the VRC in exchange for promised oversight.

All counts are expressly made against all Defendants. In its Opposition to the Motion to Dismiss, Plaintiffs concede that this Court has no jurisdiction over the federal securities law claims made in Counts 3 and 4. They also concede without explanation Count 9 ("constructive trust") and Count 10 ("mutual mistake"). See Plaintiffs' Reply at page 30. Plaintiffs Reply elsewhere says that "in light of the Court's Decision on Appointment of Receiver, it leaves the viability of the Constructive Trust claim to the discretion of the Court," which raises some question as to its' earlier express concession. Reply at 72. In that Decision, the Court found that there is no allegation that the State is holding any investor assets that could be administered by a receiver. For present purposes, the Court likewise sees no allegation that the State is holding any assets over which a constructive trust could be imposed as a remedy. Counts 3, 4, 9, and 10 are therefore dismissed for failure to state a claim upon which relief can be granted.

**Plaintiffs also appear to concede** that the State agency defendants are immune from suit for the fraud and misrepresentation claims in Counts 1, 2, 5, 7, 11-12 and 15. Their reply to Defendant's Motion to Dismiss argues only that the claims for negligence (Count 13) and breach of contract (Counts 8, 14 and 16) survive against the State. Counts 1,2, 5-8, and 11-16), for varieties of fraud and misrepresentation, breach of contract, unjust enrichment and negligence, remain against the State employees named.

The Defendants

The Defendants fall into four categories: (i) the two State agencies ACCD and DFR; (ii) VRC Executive Directors James Candido (2004-2012), Brent Raymond (2012-2015), Eugene Fullam (2015-2016) and Joan Goldstein (2016-); (iii) senior officials in ACCD Lawrence Miller (Secretary), Patricia Moulton (Secretary), Joan Goldstein (Commissioner of Department of Economic Development (2015-)) and John Kessler, Esq. (General Counsel 1997-); and (iv) senior officials in DFR Susan Donegan (Commissioner 2013-2016), William Carrigan (current Deputy Commissioner of the Securities Division and formerly Director of Examinations and Enforcement (2007-), and Michael Piecak (formerly Deputy Commissioner and now Commissioner of the Securities Division).

<u>Sovereign Immunity</u>

The State first relies on the doctrine of sovereign immunity, deceptively simply stated as follows:

> Lawsuits against the State are barred unless the State waives its sovereign immunity. *Denis Bail Bonds, Inc. v. State,* 159 Vt. 481, 484–85 (1993); see also *American Trucking Ass'ns, Inc. v. Conway,* 152 Vt. 363, 376 (1989) (holding that the doctrine of sovereign immunity precludes the maintenance of actions for the recovery of money against the State unless the State has consented to be sued).

<u>Lane v. State</u>, 174 Vt. 219, 222–23 (2002). Sovereign immunity is a defense available to the State itself, not to State employees personally. *Levinsky v. Diamond*, 151 Vt. 178, 183 (1989). Therefore, this first discussion relates to the claims against the two State agencies and not to the claims against the State employees.

Sovereign immunity is an absolute defense, except to the extent the State has waived sovereign immunity as set forth in 12 V.S.A. §5601, also known as the Vermont Tort Claims Act. That Act provides as follows:

> The State of Vermont shall be liable for injury to persons or property…caused by the negligent or wrongful act or omission of an employee of the State while acting within the scope of employment, under the same circumstances, in the same manner, and to the same extent as a private person would be liable to the claimant…

The first step in the analysis of sovereign immunity is thus to determine whether there are "private action analogs" for the remaining claims against the State agencies in this case. The State challenges all of the remaining claims against the State agencies (Counts 8, 13, 14 and 16), on this basis. The State focuses on the fact that the alleged failure of the State in each of these claims was in a duty of oversight and regulation, which are exclusively governmental functions that no private person could fail to fulfill.

"(T)he purpose of the private analog provision 'is not to bar…suits claiming injuries based on the breach of duties performed by government employees performing government services,' but merely to prevent government from being visited with novel and unprecedented liabilities untethered from any comparable common law action." *Czechorowski v. State,* 178 Vt. 524, 534 (2005), quoting *Sabia v. State,* 164 Vt. 293, 302 (1995). "Governmental liability may arise only if a plaintiff's cause of action is comparable to a cause of action against a private citizen and his allegations, taken as true, will satisfy the necessary elements of that comparable state cause of action." *Denis Bail Bonds, Inc. v. State,* 159 Vt. 481, 486 (1993).

Plaintiffs' "Contract claims", Counts 8, 14 and 16, allege breach of contract by way of a third party beneficiary theory (Count 8), unjust enrichment (Count 14) and an "express" contract arising from the payment of fees and other good and valuable consideration in exchange for State oversight (Count 16).

Count 8 stands on the exchange of promises in the MOUs between the State and the JPPs and common law recognition that a third party may have a claim for breach of a promise made in a contract between two other parties where it is "appropriate to effectuate the intention of the parties and…the circumstances indicate that the promise intended to give the beneficiary the benefit of the promised performance."  Plaintiffs' Reply at page 44, quoting *Herbert v. Pico Ski Area Management Co.,* 180 Vt. 141, 149-150 (2006), quoting the Restatement (Second) of Contracts §302(1). The fatal flaw in Plaintiffs' theory, by way of a private analog, is apparent from looking at the very authority primarily relied upon by Plaintiffs, the case of *Bayerische Landesbank v. Aladdin Capital Management, LLC*, 692 F.3d 42 (2d Cir. 2012). In that complex case, investors sued a management entity for breach of its contractual promise to an intermediary entity to properly manage a portfolio of property. There was no contract between the management entity and the investors, but it was clear that the contract that did exist-between the management entity and the intermediary-was for the benefit of the investors. The plaintiffs' claim in that case was against the promisor, i.e. the management entity, not the intermediary. By stark contrast, Plaintiffs' claim in this case is against the State as *promisee.* In the MOUs, the State did not promise to do anything by way of oversight and regulation. It was the JPPs who promised to deliver a variety of reports and information. There is no allegation of a promise by the State to the JPPs that was breached to the detriment of the Plaintiffs. Any third party action arising under common law from the MOUs lies against the JPPs, not the State. Absent a promise by the State in the MOUs, there could be no promissory duty to enforce for the benefit of the Plaintiffs. **Cite to Restatement/caselaw.**

Count 14 is marginally if at all a contract claim. The express theory of the claim is unjust enrichment, which is a common law claim in equity that rests upon the principle that no one should be allowed to enrich themselves unjustly at the expense of another. "Unjust enrichment…only exists when a party improves his or her own position at the expense of someone else." *Weed v. Weed*, 185 Vt. 83, 90 (2008). In this case, the alleged unjust enrichment claim against the State can only arise from the fees paid by investors to the VRC in connection with their EB-5 applications. But there is no allegation that the State profited, i.e. improved its' position, in any way from those fees. Nor is there allegation that they were assessed by mistake or in excess of statutory authority. Cf. *Restatement (Third) of Restitution and Unjust Enrichment,* §19 (2011). The essence of Plaintiffs' claim is that the State employee efforts funded with those fees were deficient, but the essential element of the State having improved its position by collecting the fees remains lacking. In this totality of circumstances, the Court cannot see how the State was "enriched" at Plaintiffs' expense.

The remaining Counts 6 and 13 are for gross negligence and negligence. Both require a common law duty of care to begin with, and then vary as to the degree of culpability in its breach. Count 6 alleges that the State's various representations to investors created "a special relationship with Plaintiffs that gave rise to a duty to exercise due care…" Count 13 makes no specific additional allegation as to the source of a duty. **?????**

Plaintiffs seek to avoid sovereign immunity on their negligence claims by way of reference to a line of Vermont Supreme Court cases that recognize a State duty by way of a private analog that satisfies that that threshold requirement under §5601. See, e.g. *Kennery v. State,* 191 Vt. 44 (2011). Plaintiffs allege throughout the TAC a negligent and grossly negligent

failure to perform oversight of the JPPs. They seek to avoid another line of Vermont Supreme Court cases that find no private analog in claims that the State failed in its' performance of "uniquely governmental functions." See, e.g. *Lafond v. Vt. Dept of Soc. & Rehab. Servs.,* 167 (1998)(licensing and inspection of private service providers). Conceptually, the course that Plaintiffs are trying to steer is to cross the threshold private analog requirement with claims of negligence and gross negligence and then steer clear of the waiver and discretionary act exceptions by way of the particular duty alleged to underlie the negligence claims.

The ship Plaintiffs are trying to sail is what might be called the Good Samaritan theory. It stands on the seminal case of *Indian Towing Co. v. United States,* 350 U.S. 61 (1955), in which the U.S. Coast Guard was held liable for negligent operation of a lighthouse causing wreck of a barge, absent an obligation to operate the lighthouse to begin with, on the fundamental tort principle "that one who undertakes to warn the public of danger and thereby induces reliance must perform his…task in a careful manner." *Id.*, at 64-65. The Vermont Supreme Court followed this analysis in *Kennery,* finding that the State could be liable for police officers' negligence in conducting a welfare check, despite no governmental obligation to conduct it, where they agreed to do it. Their duty arose not by statute or general duty of care but by way of the clear undertaking, citing Restatement (Second) of Torts §324A (1965) and *Indian Towing.* The officers were obligated to use the same care a private person would be obligated to use if the private person had agreed to do the welfare check. See also *McMurphy v. State,* 171 Vt. 9 (2000)(allowing an injured motorist to proceed on a negligence claim based on alleged failure to comply with design standards that the State clearly intended to comply with).

By analogy in this case, the Plaintiffs' argument is that by choosing to operate a regional center, the State accepted a duty to oversee the JPPs in a careful manner and failed to do so. "The VRC was unequivocally duty bound to comply with the standards set by USCIS regulations (and) by the standards established by its own creation." Reply at 35. In order to respect the exception of section 5601(e)(6) (discussed below), the Court believes this argument requires putting a hand over our eyes with respect to all of Plaintiffs' claims for fraud and misrepresentation, and looking instead only at the State's failure to sufficiently oversee and audit the JPPs until it was too late, having allegedly undertaken to do so from the beginning by way of creating the VRC, not because of VRC communications to investors.

Plaintiffs stand on the analysis set forth in *Denis Bail Bonds, Inc. v. State*, 159 Vt. 481 (1993), to establish the duty upon which any negligence claim would be based in this case. In that case, the Vermont Supreme Court recognized a list of "indicia in determining whether a governmental body has undertaken a duty of care toward certain persons" as follows:

(1) Whether an ordinance or statute sets forth mandatory acts clearly for the protection of a particular class of persons, rather than the public as a whole;
(2) Whether the government has actual knowledge of a condition dangerous to those persons;
(3) Whether there has been reliance by those persons on the government's representations and conduct; and
(4) Whether failure by the government to use due care would increase the risk of harm beyond its current potential.

*Id.* at 487.

It is important to keep in mind that *Denis* did not reach the sovereign immunity exceptions discussed below and was decided instead on whether there was any duty on the State that could have been breached in that case. The Court in *Denis* decided that there was no such duty in that case, so that there was a failure to state a claim to begin with and the waiver analysis did not need to be done. *Id.* at 489. But it did recognize a structure for analyzing the threshold duty question. Based on the relevant allegations in the TAC, together with "attachments thereto, or…matters the court may judicially notice," *Sprague,* supra, we consider those indicia.

Taking judicial notice of the relevant statutes and regulations, the VRC was created in 1997, within ACCD, pursuant to its' responsibility "…for the promotion of Vermont as great place to live, work, and do business in order to increase the benefits of economic development marketing, including: (1) attracting additional private investment in Vermont businesses;…(5) promoting and supporting Vermont businesses, goods, and services. 3 V.S.A.§2476(c) (added 1995).

Under federal law, as an approved EB-5 program regional center, VRC was obligated to do the following:

(6) Continued participation requirements for regional centers.
    (i) Regional centers approved for participation in the program must:
        (A) Continue to meet the requirements of section 610(a) of the Appropriations Act.
        (B) Provide USCIS with updated information annually, and/or as otherwise requested by USCIS, to demonstrate that the regional center is continuing to promote economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment in the approved geographic area, using a form designated for this purpose;

8 C.F.R. § 204.6.

The reference to section 610(a) is to the following:

SEC. 610. PILOT IMMIGRATION PROGRAM.—(a) Of the visas otherwise available under section 203(b)(5) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(5)), the Secretary of State, together with the Attorney General, shall set aside visas for a pilot program to implement the provisions of such section. Such pilot program shall involve a regional center in the United States for the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

DEPARTMENTS OF COMMERCE, JUSTICE, AND STATE, THE JUDICIARY, AND RELATED AGENCIES APPROPRIATIONS ACT, 1993., PL 102–395, October 6, 1992, 106 Stat 1828.

The Court is aware from prior pleading in connection with the Plaintiffs' Motion for a Receiver that USCIS has taken the position, in its Notice to Terminate the VRC as an approved regional center, that:

…a regional center that takes actions that undermine investors' ability to comply with EB-5 statutory and regulatory requirements such that investors cannot obtain EB-5 classification through investment in the regional center…(and/or) fails to engage in proper monitoring and oversight of the capital investment activities…*may* no longer serve the purpose of promoting economic growth in compliance with the Program and its authorities.

Notice of Intent to Terminate dated August 14, 2017, at page 16, attached to Plaintiffs' Emergency Motion to Appoint Receiver (italics added).

However, as best the Court can tell, neither the state or federal laws quoted above obligated the State to audit or oversee the inner workings of an EB-5 funded project. The fact that the USCIS has expressed its view that the listed failures *may* indicate that the VRC is failing in its required mission of *promoting economic growth* does not translate into an established audit requirement. In short, the Court cannot identify any statute or regulation that sets forth any specific mandatory acts of a regional center during the relevant time period in this case that are directed at protection of the commercial interests of investor immigrants. Both the state and federal authorizing legislation are all about promoting economic growth and perhaps immigration law, not securities regulation.

It was not until 2015 that any statute or regulation the Court can find imposed any express obligation of ACCD and DFR to conduct audits and/or use other means to actively regulate EB-5 projects that ACCD had been promoting. In 2015, immediately after the December 2014 MOU between ACCD and DFR, a specific statute was enacted for the "EB-5 Program; regulation; oversight." 10 V.S.A. §20. That appears to be the first clear expression of obligations for "ongoing oversight and compliance of approved projects, including annual audits," "the establishment of escrow accounts for capital investments and third-party oversight of requisitions," and "investor relations and a formal complaint protocol." That new law, together with the December 2014 MOU that added DFR to the mix, were clearly responses to the last eight years of Jay Peak activities. An evidently good idea, however, based on hindsight and experience, does not translate into a pre-existing legal obligation and undertaking.

Another potential source of undertaking was in the MOUs referred to above. As discussed above, however, the MOUs did not set forth a duty of the State to audit the JPPs but rather imposed a set of obligations on the JPPs.

Whether, or more aptly when, the government had actual knowledge of a dangerous condition appears to be a question of disputed fact, but taking the Plaintiffs' allegations in their best light, the earliest that knowledge allegedly existed appears to be 2012 when the dispute arose with the VRC consulting firm and the firm disclaimed confidence in the JPPs. The TAC alleges that "Beginning in 2012, if not earlier, additional individuals (besides the consultant) put the VRC…on notice of the Jay Peak Projects' fraud." Para. 139. That was six years into the situation, although four years from the State filing suit against the Jay Peak principals.

The final indicia of reliance on government representations and conduct is of course highlighted through Plaintiffs' complaint, as is the allegation that State investigation at an earlier state would have reduced the ongoing risk of harm.

A close look at *Denis* tells this Court that the absence of any statutory basis for a duty to protect a particular class of persons was a determining factor. It clearly was "the heart of" the matter. *Denis*, 159 Vt. at 487. In that case, the State had a clear statutory duty to regulate insurance agents in the State, and even to report to their "appointing insurers" (which the plaintiff was in that instance) if an agent's license was suspended or revoked. But there was no specific statutory duty to report to those appointing insurers prior to suspension or revocation. Nor could the Court find a duty in the State's obligations to the general public to protect them from untrustworthy agents. The Supreme Court's conclusion that there was no duty in that case was bolstered by the fact that there were no allegations that the State knew of the plaintiff's existence as the bondsman's principal or that the principal had relied on the State to supervise its' bondsman agent. Perhaps the crux was "it would be a great expansion of the concept of duty to allow the principal to pass the obligation to supervise an insurance agent on to the state..." 159 Vt. at 489.

By contrast, the Vermont Supreme Court in *Sabia v. State*, 164 Vt. 293 (1995), found that a private analog for negligence existed for a claim against the State Department of Socal and Rehabilitative Services for failure to protect two sisters from reported sexual abuse. In that case, the Court recognized that the State had a clear statutory duty to protect children from abuse, and that there is a "very special" relationship between a specifically identified abused child and the agency such that "social policy considerations warrant the imposition of liability" on the State. Those considerations included both compensation to the abused children and encouragement of the agency to perform it duty diligently in the future. 164 Vt. at 306.

In this case, we cannot find a statutory or regulatory duty to regulate the JPPs, at least until Section 20 was adopted, much less to do so for the benefit of the investors. We can see the other indicia set forth in *Denis*, but we also see a similar crux. It would be a great expansion of the concept of the State's statutory duty to promote economic development to make it effectively an insurer of private economic investment in private economic development.

In summary, the Court cannot find any source, other than the alleged misrepresentations made in communications to investors by the VRC, that established a duty of care to investors with respect to how their investment funds were actually used by the Jay Peak principals. The State did not build and operate a lighthouse to warn shipping, cf. *Indian Towing*, or an air traffic control system, cf. *Ingham v. Eastern Air Lines, Inc., 373 f.2d 227 (2d Cir. 1967)(*also cited by Plaintiffs). Nor did the State take over the JPPs and assume responsibility for their operation as the FDIC did with the bank at issue in the other authority relied upon by Plaintiffs. Cf. *In Re Franklin National Bank Securities Litigation,* 445 F.Supp. 574 (E.D.N.Y. 1978). The State built a promotional agency in order to bring investment and economic development to the State. Nor did the State undertake the act of a Good Samaritan by way of telling the investors it would confirm or eliminate their concerns, other than by the alleged misrepresentations, until the 2015 adoption of Section 20. In fact, the Plaintiffs' complaint is that when concerns arose, the State refused to do just that and disclaimed the responsibility.

To be sure, the Court sees that the alleged representations made to investors by VRC officials in the process of doing their promotional work set out a State undertaking to oversee and even audit the JPPs, but this analysis has to be about the duty, if any, that the State undertook *other than* by those representations. Again, the Court reaches that conclusion on the ground that the fraud and misrepresentation exception discussed below bars any claim that depends on misrepresentation.

In that light, the facts alleged here appear to fall into the category of cases in which the injuries arose "from the plaintiffs' commercial decisions based on the government's misrepresentations" rather than the cases that recognize a duty independent of a duty of truthful communication. See *Zelaya v. United States,* 781 F.3d 1315, 1337 (11th Cir. 2015)*.* The Eleventh Circuit in *Zelaya,* in its survey of caselaw, recognized a series of cases in which courts chose not to apply the misrepresentation exception even where a governmental misrepresentation was alleged, where the courts found an independent duty had been breached. "It is true that misrepresentation exception 'does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty.'" 781 F.3d at 1335, quoting *Block v. Neal,* 460 U.S. 289, 297 (1983). In this case, the Court can find no such independent duty.

Therefore, the Court concludes that the Plaintiffs have failed to state a claim for negligence or gross negligence against the State, absent a duty of care independent of the alleged misrepresentations.

Analysis of the Exceptions to the Exception of the Vermont Tort Claims Act

In case the Court has been mistaken in its analysis of duties set forth above, and since the parties have thoroughly briefed them, the Court also addresses two exceptions to the State's waiver of sovereign immunity that would bar Plaintiffs' claims even if there are private analogs for them.

Following the language of Section 5601 quoted above, the statute proceeds to list various exceptions, as follows:

This section shall not apply to:

(1) Any claim based upon an act or omission of an employee of the State…based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a State agency or an employee of the State, whether or not the discretion involved is abused…

(6) Any claim arising out of alleged…misrepresentation, deceit, fraud, or interference with contractual rights.

The Court concludes that all of Plaintiffs' claims are barred by these "exceptions to the exception" under Section 5601.

12

<u>Fraud and Misrepresentation Exception</u>

The State stands first on the misrepresentation and fraud exception set forth above in §5601(e)(6) with respect to Counts 1, 2, 5, 6, 7, 11, 12 and 15. The State argues that all of those counts are essentially for fraud or misrepresentation and therefore no waiver of immunity exists. Plaintiffs do not expressly concede that argument, but do not contest it in their opposition to the motion to dismiss except for Count 6. Given the express titles of the counts and the facts alleged in support of them, the Court agrees with the State, and also includes Counts 8 (third party beneficiary), Count 13 (negligence) and Count 14 (unjust enrichment). Counts 1, 2, 5, 11, 12 and 15 are expressly for fraud or misrepresentation. Count 6 for gross negligence or willful misconduct is clearly also based on the alleged fraud or misrepresentation, in that it stands on the concept of a duty the State allegedly undertook by way of its continuing representations to investors, breached by its gross failure to follow through on its assurances. The same holds for Count 7 for breach of fiduciary duty where the alleged duty arose from the alleged fraud or misrepresentation. Counts 11 and 12 for aiding and abetting fraud stand on the concept of holding the State liable for the fraud committed by the Jay Peak principals, but the underlying claim is still for fraud. Count 13 for negligence stands largely on the State having "built a lighthouse" by way of its representations to investors. Count 14 for unjust enrichment stands largely on the inequity of the State avoiding the consequences of its representations. And Count 16 for breach of contract also stands on a misrepresented "promise" of oversight and regulation.

The Court looks to federal caselaw to find comparable circumstances and claims. The Vermont Supreme Court has recognized that such caselaw interpreting the Federal Tort Claims Act is particularly useful as it so close parallels the language and intent of the Vermont Tort Claims Act. See *Kennery,* supra at 44 ("the relevant analytical approaches of the FTCA and VTCA are the same"); *Lane v. State,* supra at fn. 2 ("This Court therefore looks to case law interpreting the federal provision to guide us in analyzing 12 V.S.A.§5601(e).")

In *Zelaya v. United States,* 781 F.3d 1315 (11th Cir. 2015), the plaintiffs brought a claim for negligence against the Securities and Exchange Commission ("SEC") for failing to tell investors that a certain investment fund was actually a PONZI scheme. That Court began by noting the long standing interpretation of "arising out of" in both federal and state waiver exemptions for misrepresentation claims.

> The phrase 'arising out of' is interpreted broadly to include all injuries that are dependent upon on of the listed torts having been committed. *United States v. Shearer*, 473 U.S. 52,55 (1985)…So, a claim will be deemed to have arisen from (an) excepted tort if the governmental conduct that is essential to the plaintiff's cause of action is encompassed by that tort. And this is so even if the plaintiff has denominated, as the basis for the cause of action, a tort not found within…the list of excepted torts.

*Id.* at 1333, relied upon in *Alvarez v. United States,* 862 F.3d 1297 (11 Cir. 2017)(where plaintiffs brought a claim against the government for negligence and aiding and abetting a private retirement fund advisor in promoting another PONZI scheme).

In both *Zelaya* and *Alvarez*, the plaintiffs tried to avoid the misrepresentation exception by way of pleading negligence. The Federal Tort Claims Act does not expressly mention fraud like the Vermont Act does, but the caselaw on misrepresentation under the FTCA clearly speaks to both misrepresentation and fraud as those terms are used in the Vermont Act. In both of those cases, the allegations were that the government had fallen down by both failing to stop a private actor in committing fraud and in endorsing a private actor in committing fraud. The plaintiffs' claims sounded not only in negligence but also in "aiding and abetting" a fraud and breach of a fiduciary duty. On each of those counts, the Court turned again and again to the principle set out in *Zelaya*, namely that where the basis for each of the allegedly breached duties was conduct fundamentally known as misrepresentation under the common law-"the communication of misinformation on which the recipient relies," *Alvarez* at 1305, the waiver exception applies.

This Court concludes that the "arising out of" language of the intentional tort exception thus extends to Counts 6 (gross negligence), 7 (breach of fiduciary duty arising from State promoting reliability and integrity of investment), 8 (third party beneficiary theory based on inclusion of MOUs in offering materials), 11 and 12 (aiding and abetting fraud), 13 (negligence), 14 (unjust enrichment) and 16 (breach of contract) as well as the Counts that sound expressly in fraud or misrepresentation. All stand on the same allegations that the State took on a duty by way of its' representations to the Plaintiffs.

Discretionary Acts Exception

The State also argues that Counts 6-16 are also barred by way of the exception set forth in §5601(e)(1) quoted above, also known as the "discretionary acts" exception. "The purpose of this exception is to ensure that the courts do not 'pass judgment on legislative or administrative policy decisions through tort law." *Kennery v. State,* 191 Vt. at 60, quoting *Sabia v. State,* 164 Vt. 293, 307 (1995). The Vermont Supreme Court has adopted a two step test from *United States v. Gaubert,* 499 U.S. 315 (1991).

First, "a court must determine whether a statute, regulation, or policy mandates certain acts, or whether performance of a duty involved an element of judgment or choice." *Kennery,* 191 Vt. at 60, citing *Searles v. Agency of Transportation,* 171 Vt. 562, 563-4 (2000). Based on the analysis above as to the statutory and regulatory requirements for the VRC, the Court does not see a clear mandate to the VRC to perform oversight and regulation of EB-5 projects until the enactment of 10 V.S.A. §20 in 2015. To the contrary, its mandate was the broad strokes of 3 V.S.A. §2476(c) that were all about economic development and promotion and not about regulation.

Second, the court must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* "The exception protects only governmental actions and decisions based on considerations of public policy." *Kennery,* 191 Vt. at 60, citing *Gaubert. "*However, 'when a statute, regulation or policy vests discretion in the (government) employee, it is presumed that the employee's acts are grounded in (public) policy when exercising that discretion.'" *Id.,* quoting *Johnson v. Agency of Transportation,* 180 Vt. 493 (2006).

It is hard to imagine a scenario in which State employees have ever been vested with more discretion than in this instance. Wise or unwise, the authorizing legislation for the ACCD was a virtual carte blanche to promote investment in Vermont, with no corresponding obligation to regulate it. ACCD employees were guided only by the broad declarations of public policy in favor of fostering economic growth. How they went about it necessarily involved establishing priorities, allocation of resources and determination of strategies for private/public partnerships that involved balancing a variety of concerns. This was not how to safely conduct a police welfare check (*Kennery)* or determining the speed and plow angle of snowplow operation. See *Morway v. Trombley*, 173 Vt. 266, 273 (2001). The fact that the Legislature found it necessary to adopt Section 20 in 2015 only confirms how much of an open range ACCD had had with the VRC until that point.

Based on that analysis, the Court further concludes that Counts 6-16 are all barred by the discretionary acts exception and thereby the doctrine of sovereign immunity, as pled against the State agencies.

Official Immunity

Turning to the Plaintiffs' claims against the various State officials, we turn to a different kind of common law immunity. Sovereign immunity applies only to the State itself and not to claims against State employees. *Levinsky v. Diamond,* 151 Vt. 178, 183 (1989). Official immunity provides two levels of protection to State officials. Judges, legislators and the highest executive officers have absolute immunity for acts performed within their respective authorities. Lower-level officers and employees are immune to the extent their actions alleged: (1) were performed within their scope of authority; (2) performed in good faith; and (3) were discretionary versus ministerial acts. *Id.,* citing *Libercent v. Aldrich,* 149 Vt. 76, 81 (1987). As to the higher level of absolute immunity, the doctrine recognizes the potential that the covered officials could be dishonest and otherwise guilty of bad motive and intention such that on the one hand "it would be monstrous to deny recovery." *Id.*, quoting Judge Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d. Cir 1949). On the other hand, however, it is "better to leave unrepressed the wrongs done by dishonest officers than to subject those to try to do their duty to the constant dread of retaliation," particularly where it is generally impossible to know whether the claim is well founded until the case has been tried. *Id.*

Applying that doctrine, the Vermont Supreme Court has found the Attorney General, the Commissioner of the Department of Social Welfare, the Commissioner of the Department of Liquor Control and State's Attorneys protected by absolute immunity. *Levinsky,* supra; *Amy's Enterprises v. Sorrell*, 174 Vt. 623 (2002); *O'Connor v. Donovan,* 191 Vt. 412 (2012). By contrast, general counsel to a Department, assistant and deputy attorneys general, and state troopers were entitled only to the lesser protection of qualified immunity. *Czechorowski v. State,* 178 Vt. 524 (2005); *Levinsky,* supra; *Kennery v. State,* 191 Vt. 44 (2011).

Applying that doctrine in the instant case, we look first at the executive officer defendants here. As the Secretaries of the Agency of Commerce and Development, Defendants Miller and Moulton were protected by absolute immunity so long as their acts alleged were performed within their authority. Secretary Miller is alleged to have joined in the promotion of

the JPPs by attending trade shows soliciting investors. Secretary Moulton is alleged to have stonewalled investor concerns by disclaiming all responsibility to the investors when their concerns were brought to her in 2014. Plaintiffs argue that both Secretaries were acting outside their authority because there was no statutory authority for the VRC activity until Section 20 was enacted in 2015 ("In this instance, Plaintiffs agree that she (Moulton) did not have the statutory authority to vet the Jay Peak Projects." Reply at 67). To the contrary, however, the Court sees the broad authority to promote Vermont business opportunities and support Vermont business set forth in 3 V.S.A. 2476(c) quoted above. Both were clearly acting within their authority in doing so and are therefore immune from suit in this case.

Likewise, the Commissioner of the Department of Economic Development within ACCD, Joan Goldstein, and the Commissioner of the Department of Financial Regulation Susan Donegan are also absolutely immune to the extent they were acting within their authority. Commissioners are the "chief executive officer…and head of the department" who "determine the policies of the department," administer the laws assigned to the department, coordinate and integrate the work of all divisions in the department and supervise and control all staff functions." 3 V.S.A. 2451-2; **cite as to DFR.** Commissioner Goldstein is not alleged to have engaged in any particular act other than to also serve as the acting Executive Director of the VRC starting in June 2016, long after the alleged culpable acts occurred, and there is no allegation that she acted outside her authority in that role. Commissioner Donegan is not alleged to have engaged in any particular act other than to have served as the Commissioner of DFR from 2013-16 and to have overseen to some degree the initial phase of DFR oversight of the VRC in early 2015 and review of proposed securities offering documents submitted to the Department for review in connection with the last two JPPs in 2015. There is no specific allegation in the TAC that she acted outside her authority in those roles. Plaintiffs attempt to argue that Commissioner Donegan acted outside her authority by engaging in "the most unusual of circumstances" once DFR became a principal administrator of the VRC along with ACCD in 2015. The Court cannot see how she was acting outside her authority where statute (10 V.S.A. 20) directed her to do just that, including establishing "required provisions pertaining to private placement memoranda." 10 V.S.A. 20(d)(3). That authority was anticipated by a matter of a month or months by the MOU between ACCD and DFR, but was clearly part of the same State effort to increase its regulatory role with respect to EB-5 projects.

Both Commissioners are therefore immune from suit in this case.

Defendants Carrigan and Piecak served as Deputy Commissioners of the Securities Division in the DFR. Pieciak also came to serve as the Commissioner, although the date of that promotion is not in the pleadings. In that role, they had broad authority over securities regulation that included investigation of possible securities law violations and pursuit of civil enforcement actions. 9 V.S.A. 5602-03. There is no specific allegation that Deputy Commissioner Carrigan did or failed to do anything in particular in connection with the JPPs. The most Plaintiffs argue in their Reply is to suggest that he acquired a kind of vicarious liability for whatever ACCD and the VRC had done before the ACCD/DFR MOU was signed and Section 20 was enacted to formally authorize that collaboration. Reply at 68-69. Defendant Pieciak, meanwhile, is argued to have no absolute immunity for reasons "the same as for Defendant Donegan." Both Carrigan and Pieciak are lumped in as having engaged in conduct in the "most unusual of circumstances," "specifically, with Jay Peak investor complaints and media coverage

16

building, on December 12, 2014, or thereabouts, the DFR and ACCD signed a memorandum of understanding…whereby DFR became a principal administrator and partner of the VRC…" Reply at 68. Thus, the only specific allegation referenced is the signing of the DFR/ACCD MOU that was clearly intended to bolster the State's oversight of EB-5 projects, not to engage in any wrongdoing. Other than a vague suggestion of acquiring vicarious liability for whatever had gone before, there is nothing here that suggests "the most unusual of circumstances." Even in the only case cited by Plaintiffs for this proposition, the court there refused to recognize such circumstances even where the conduct alleged was that officials of the New York Stock Exchange, a quasi-governmental entity, had allegedly encouraged fraudulent regulatory reports by securities marketers and alerted the marketers to the prospect of investigation in order to give them the opportunity to conceal their wrongdoing. *In Re New York Stock Exchange Specialists Securities Litigation,* 503 F.3d 89 (2d. Cir. 2007). By contrast, Plaintiffs' complaint against Defendants Carrigan and Pieciak alleges only a kind of guilt by association, and perhaps a failure to adequately enforce Vermont securities laws.

As to their duties to enforce Vermont securities laws, these appear to be essential prosecutorial duties. **Statute** Although Vermont Supreme Court cases addressing this question all appear to have involved lawyers engaged in civil or criminal enforcement actions, see *Czechorowski v. State*, supra, and *O'Connor,* supra, it is clear that the role of the Securities Division includes investigation and civil enforcement actions for securities law violations. Indeed, that is the very responsibility Plaintiffs suggest it failed to fulfill. This Court does not see any significant distinction for this purpose, based on whether or not the "prosecutorial" official is a lawyer.